[Civ. No. 2032. Second Appellate District.—July 24, 1916.]

¶In the Matter of the Application for the Disbarment of WILSON H. SOALE, an Attorney at Law.

ATTORNEY AT LAW—DISBARMENT PROCEEDING—VIOLATION OF CONFIDENCE OF CLIENT—SUFFICIENCY OF EVIDENCE.—In this proceeding for the disbarment of an attorney at law for violating his oath in certain transactions involving the property of a client, it is held that on the record the court was justified in determining that the accused violated such oath, that the client reposed confidence in him, and that he abused such confidence.

ID.—JUDGMENT OF SUSPENSION—TIME—CONTINGENT UPON PAYMENT OF CLAIM OF ACCUSER.—A judgment suspending an attorney at law for one year "and thereafter until the claim of the accuser is fully paid," is warranted, if the amount is ascertained, but is too uncertain to be enforced, except as to the stated period of one year, where the corporate stock wrongfully purchased by the attorney with the money of his client is not shown to be wholly worthless, and the amount lost thereby is not determined.

ID.—SUSPENSION OF ATTORNEY FOR UNLIMITED PERIOD.—In a disbarment proceeding an attorney may be suspended for a period not necessarily limited as a fixed and determinate period of time, but for an uncertain time, subject to the right of the accused to relieve himself therefrom by making restitution of a stated amount of money which he had improperly obtained by means of his misconduct.

APPEAL from a judgment of the Superior Court of Los Angeles County disbarring an attorney at law from practice. Fred H. Taft, Judge.

The facts are stated in the opinion of the court.

Gray, Barker & Bowen, Wheaton A. Gray, and Bennett & Carey, for Appellant.

Schweitzer & Hutton, for Respondent.

CONREY, P. J.—The Los Angeles Bar Association filed in the superior court of Los Angeles County an accusation verified by the oath of one Grace A. Hilborn, charging that Wilson H. Soale had violated his oath as an attorney and counselor at law by the commission of certain acts therein described. An answer was filed denying the facts alleged as showing defendant's misconduct. After trial of the issues thus presented the court found that all of the allegations of the ac-

cusation are true, and it was ordered "that the accused, Wilson H. Soale, be deprived of the right to practice as an attorney at law in the state of California for one year from date hereof, and thereafter until the claim of the accuser, Grace A. Hilborn, against said accused is fully paid." From this judgment he appeals.

In September, 1909, and thereafter during the occurrence of the transactions involved in this case, Mr. Soale, as a member of the firm of Soale & Crump, was engaged in practice as an attorney and counselor at law in the city of Pasadena, California. At the beginning of these transactions the lady now known as Grace A. Hilborn was Grace Hilborn Jenkins, the wife of one Jenkins. In September, 1909, Mrs. Jenkins went into the office of Soale & Crump and entered into a discussion with Mr. Soale concerning her business affairs and her property. As a result of that discussion, as she was expecting to be absent from Los Angeles County for some time, Mrs. Jenkins executed to Mr. Soale and Mr. Crump, as copartners, a general power of attorney, which, among other things, authorized them to convey real property for her and in her name. According to her testimony this was done pursuant to a suggestion by Mr. Soale that she would do well to let them care for the property and look out for it for her. Acting under this employment and authority, an exchange of property was negotiated by which, in return for five acres of land owned by Mrs. Jenkins near Alhambra, she acquired one thousand dollars and a house and lot in Pasadena, which we will designate as the Summit Avenue property. The matters complained of in this proceeding relate to an additional transaction in which Mrs. Jenkins received four thousand shares of stock of a corporation called the Automatic Car Coupler Company, in exchange for the Summit Avenue property.

In January, 1910, Mrs. Jenkins consulted Mr. Soale about obtaining a divorce from her husband, and an agreement was made as to the amount of the fee to be paid to Soale & Crump for their services in that matter. Such is the effect of the testimony of Mrs. Jenkins. The complaint in the divorce action was not filed until some months after the first consultation, and it was during that interval that the transactions occurred which are the subject of the complaint herein.

The Automatic Car Coupler Company appears to have been incorporated in the early part of the year 1909, with a capital

stock of fifty thousand shares of the par value of one dollar each. It was organized in Pasadena, and its principal business grew out of an automatic car coupler invention which was transferred to the corporation in return for certain shares of the stock. At the same time shares of treasury stock were sold at ten cents per share, and from time to time during the year 1909 the price was advanced by resolution of the directors of the corporation until they had raised it to par for sales by the company. Mr. Soale was one of the early stockholders. He owned four thousand shares of stock acquired at ten cents per share. Soale & Crump also owned one thousand shares of stock. The four thousand shares belonging to Mr. Soale are. the same shares that were transferred to Mrs. Jenkins in exchange for the Summit Avenue property, and under the circumstances to which we shall refer. In November, 1909, Mr. Soale caused the four thousand shares to be transferred to his son-in-law, Lewis Sprague, and left the new certificate with Mrs. Sprague for her husband. Soale received no consideration for this transfer.

Dr. D. T. Bentley, a retired physician residing in Pasadena, was engaged in the real estate business. He was acquainted with Mr. Soale and occasionally consulted him in regard to legal matters. Mr. Soale informed him that Mrs. Jenkins wanted to trade her Summit Avenue property for stock. Thereupon Dr. Bentley called upon Mrs. Jenkins and entered into negotiations with her for the transfer of her property to Sprague in exchange for the four thousand shares which were represented as the property of Sprague. Thereupon Mrs. Jenkins called upon Mr. Soale and told him of Dr. Bentley's proposition, and that she had told Dr. Bentley that she would do just exactly as Mr. Soale said, and asked him if he knew anything about the automatic car coupler stock. Soale replied that he had stock in the company; that he was surprised that any stock had been offered for sale; that it was a splendid company, had five hundred dollars in the treasury, and that she would be very lucky to get it. He said: "I have stock in it myself, so I can watch and care for it for you just exactly and take care of it for you. You leave it to me." A few days later she called at the office and Mr. Soale told her that the deed was made out and ready for her to sign and the certificate of stock ordered. She signed the deed and he handed her the certificate. The

terms of the transaction were that in exchange for the stock, received at a valuation of four thousand dollars, Mrs. Jenkins transferred the Summit Avenue property at a valuation of five thousand dollars, but subject to a two thousand dollar mortgage, and in addition thereto paid one thousand dollars. This one thousand dollars was paid by checks to the order of Sprague, indorsed by him, and the proceeds received by Soale. The only way in which Mr. Soale paid over the money to Sprague was by using it in payment of bills incurred for the support of Sprague and his family. It seems that Sprague had never been able to support his family, and that Mr. Soale was in the habit of contributing largely to the support of that family by paying its bills along with his own.

During these negotiations Mr. Soale stated to Mrs. Jenkins that he had been looking this thing up, and Lewis Sprague was a man about town who wanted a home and was willing to trade, but did not tell her, and she did not know until long afterward, that Sprague was Soale's son-in-law, or that any financial or business relations existed between Soale and Sprague. Immediately after the Summit Avenue property was conveyed to Sprague, Mr. Soale placed that property in the hands of real estate agents for sale. In placing the property with B. O. Kendall Company, as agents, he gave a price of five thousand dollars, and stated that "it is a snap and will not be on the market long until it is sold." The deed by which Mrs. Jenkins conveyed the Summit Avenue property to Lewis Sprague was executed on the second day of March, 1910, and recorded July 28, 1910. On the same day, and immediately following the record of that deed, there was recorded another conveyance executed July 26, 1910, whereby Lewis Sprague and his wife conveyed the same property to Wilson H. Soale. A few months later Mr. Soale conveyed the Summit Avenue property to a purchaser subject to the existing two thousand dollar mortgage, and received a further consideration of two thousand dollars. He testified that this two thousand dollars went to Sprague, his son-in-law; but he further stated that this was done by paying bills amounting to two thousand dollars and a great deal more for the sustenance of his son-in-law and his family. They were paid with Soale's checks. "That is the way the business was carried on most of the time they were married. I

was disbursing agent for the whole family and they brought the bills to me."

Dr. Bentley claimed a commission for negotiating the trade in which he acted as agent. When Mrs. Jenkins informed Mr. Soale that Bentley wanted to charge her a commission, Mr. Soale said: "Never mind; you leave it all to me. I will see Bentley and see what can be done. You leave it all for me." Later he told her that he had managed to get Dr. Bentley down to $50, and she paid that amount through Soale to Bentley. Soale paid Bentley an additional sum of $150 out of the one thousand dollars obtained from Mrs. Jenkins in the trade, but did not inform Mrs. Jenkins, and she did not know that anything was being paid to Bentley other that the $50 paid as above stated.

Many of the facts given in the foregoing statement were denied by appellant in his testimony, but are supported by other evidence. We give them as the facts in the case because the court found that all of the allegations stated in the accusation are true, and it is necessarily implied that the court found these facts in accordance with the testimony of the accusing witness and against the testimony of appellant. Under the well-established rule, a court of appeal must assume the facts to be as found by the trial court when those facts find support in the evidence, notwithstanding other evidence to the contrary.

Aside from their contention that some of the facts above stated are not supported by the evidence, counsel for appellant insist that there is no evidence to support the implied finding that the shares of stock transferred to Mrs. Jenkins were not substantially worth four thousand dollars, or one dollar per share, as they were assumed to be in making the exchange. They further contend that, even if appellant defrauded Mrs. Jenkins in the transaction, he was not in that transaction acting as an attorney at law, and could not be said to have violated his oath and duty as an attorney at law by anything that he did therein. Finally they say that the court exceeded its authority in rendering the judgment, which not only ordered that the accused be deprived of the right to practice as an attorney at law in the state of California for one year from the date thereof, but further deprived him of that right "until the claim of the accuser, Grace A. Hilborn, against said accused is fully paid."

Aside from the patent rights transferred to it and possibly a small sum of money in the treasury, the only asset of the Automatic Car Coupler Company in March, 1910, seems to have been a certain contract dated November 1, 1909, made between that corporation and the Electric Traction Supply Company, a Missouri corporation, by which the latter company was given the exclusive right to manufacture and sell the said patented automatic couplings within the United States of America. Certain obligations were entered into by the Missouri company for the payment of royalties, and a minimum amount was named for a series of years commencing with the year beginning November 1, 1910. It was not shown that any business has ever been transacted under that contract or any income received therefrom. Prior to March, 1910, the Automatic Car Coupler Company had manufactured a limited number of car couplers, which had been given or loaned to certain railway corporations, evidently for advertising purposes. It is stated in the testimony of Mrs. Jenkins that when she consulted Mr. Soale about the proposed exchange involved in this case, he said that the Automatic Car Coupler Company stock was well worth a dollar per share, and perhaps more. He also told her of the contract with the Electric Traction Supply Company, and said that on account of this contract the stock would be as good as six per cent from the 1st of November, 1910; but he also gave her a copy of the contract and she took it away with her. On behalf of the accuser only one witness was questioned about the value of the Automatic Car Coupler Company's stock, and he did not claim to know anything about its value. Over defendant's objection this witness, J. W. Dubbs, was permitted to say that when he bought stock in the company about one year before March, 1910, he bought it from the company and paid ten cents a share. At the close of the case for the prosecution, defendant's counsel moved for a nonsuit, but as it was in general terms and did not specify any particular defect in the evidence, that motion should be disregarded. (*Coffey v. Greenfield*, 62 Cal. 602, 608; *Schroeder v. Mauzy*, 16 Cal. App. 443, 450, [118 Pac. 459].) The defendant introduced much evidence to support his claim that the market value of stock in this company was equal to or in excess of the par value, and it is our duty to consider all of the evidence and determine whether as a whole the evidence is sufficient to sus-

tain the implied finding against defendant on this branch of the case; for notwithstanding testimony to the contrary, the finding must be sustained if the record contains evidence which by itself would be sufficient to support such finding. We will refer to defendant's witnesses in the order of the references to their testimony in the brief of his counsel. Karl Elliott was the secretary of the corporation. He knew of sales made early in 1910 at one dollar per share, and one sale at one dollar and twenty-five cents per share. The first stock sold by the company was at ten cents a share, the next price was twenty-five cents a share, next fifty cents a share, and late in 1909, eighty cents a share. After that the asked price was one dollar, but no sales made by the company at that price.

Frank R. Bonny was president of the corporation. His regular occupation was that of a conductor in the freight department of an electric railroad. He said that he knew the value of the Automatic stock in March, 1910, and that it was one dollar and twelve and one-half cents per share. He sold two hundred shares of his stock at that time and at that price. It was much sought after, and still worth one dollar per share even down to the date of the trial in April, 1913. He knew of other sales as follows: one thousand shares sold in August, 1909, by the corporation, at eighty cents; four hundred shares sold in August, 1909, by the corporation, at eighty cents; two hundred shares sold in December, 1909, at one dollar, by the witness to Mr. Heiss; five hundred shares sold by the witness in November, 1909, at one dollar per share; two hundred and fifty shares bought by the witness July 15, 1910, at one dollar and twenty-five cents per share; three thousand eight hundred shares bought July 1, 1910, by Mr. Goode, at one dollar per share; three thousand four hundred shares bought in March, 1911, by Mr. Goode at one dollar per share. The principal part of Mr. Bonny's stock consisted of ten thousand shares issued to him by the company in return for the patent rights which he transferred to it in March, 1909. He had a few other small transactions in the stock besides those above noted. The following occurred on his cross-examination: "Q. Did you ever place any of this on the public market for sale? A. No, sir. Q. Do you know whether any of it ever was placed on the market for sale? A. I don't know. Q. All the sales were among your own people and your associates,

were they not? A. It was. Q. Officers of the corporation and their associates; all of it was made that way? A. Yes."

E. S. Goode became a stockholder in this corporation in April, 1910, when he purchased between eleven thousand and twelve thousand shares at one dollar per share. While he asserted that he would not now take less than that amount for his stock, he did not claim that he knew at any time what the stock was worth in the market. On cross-examination this witness admitted that after purchasing the stock in question he made an assignment for the benefit of his creditors and did not list this property as part of his assets. "I bought the stock in my name and transferred it to my wife and nephew, except fifty shares stood in my name. . . . I was trying to buy a controlling interest in the company. Would do it to-day if I could get it."

The defendant, Wilson H. Soale, testifying about the stock transferred to Mrs. Jenkins, was asked: "Is that stock worth any money now?" to which he replied: "Certainly; it is worth more than it was traded for." C. M. Gruell, a shipping clerk, testified that the stock was quoted at from one dollar to one dollar and thirteen cents in the early part of 1910. Cross-examination developed that he had very little actual knowledge of the subject. C. H. Wills testified that the market value of the stock in the early part of 1910 was eighty cents per share. He had bought some of the stock from the company when it was ten cents per share, and later sold some to Mr. Bonny at one dollar per share. F. H. Norwood, the original patentee of the automatic car coupler, testified that the value of the stock in March, 1910, was eighty cents per share; that shortly before that time he sold some stock to Mr. Bonny at one dollar per share. Norwood also testified that he received ten thousand shares of the stock in consideration of the transfer of his patent rights to the company. Whether he and Bonny received ten thousand shares each for the transfer of separate patents, or received that number of shares jointly for a joint transfer of patents, does not clearly appear. Frank L. Heiss, clothing merchant, testified that the value of this stock on the market in February and March, 1910, was one dollar per share. He bought his stock from Bonny at that price and knew of other sales at the same price.

On this record was the court justified in determining that the accused violated his oath and his duties as an attorney and counselor at law? One of the stipulations in the statutory oath is that the person admitted will faithfully discharge the duties of an attorney and counselor at law to the best of his knowledge and ability. One of these duties requires the attorney and counselor "to maintain inviolate the confidence . . . of his client." (Code Civ. Proc., sec. 282, subd. 5.) In order to support the charges here, it must have appeared that Mrs. Jenkins was Mr. Soale's client, that she reposed confidence in him as a counselor at law, and that he violated that confidence. On behalf of the accused it is contended that in connection with the exchange of Mrs. Jenkins' Summit Avenue property for corporation stock, he was not acting in his capacity as an attorney, "because in its nature the act complained of was a personal business transaction requiring no skill of attorney and no knowledge or understanding of law." The causes for which an attorney may be removed or suspended are stated in section 287 of the Code of Civil Procedure. Under that section as amended in 1911 this defense could not be maintained; but if the nature of the facts is such as claimed by the accused, that would be a good defense against charges based, as these are, upon transactions occurring in the year 1910. Thus, in the case of *In re Collins*, 147 Cal. 8, 12, [81 Pac. 220], where it clearly appeared that the acts complained of were not done by the respondent in his professional capacity or in connection with any matters in which his duties as an attorney were involved, it was held that "to the extent that an attorney may be disbarred for causes which affect his moral integrity in dealings with others of a purely personal character, and transacted in his private capacity, the statute has provided that it shall be done by the court only when he has been convicted of a felony, or of a misdemeanor involving moral turpitude." It is our opinion, however, that in these transactions Mrs. Jenkins reposed confidence in Mr. Soale as a counselor at law. The evidence does not indicate that he was engaged in business as an agent or broker or maintained his office for any purpose other than in the course of his profession as an attorney and counselor. She went to him in that office and called upon him for advice and assistance in the conduct of her business affairs, without any notice or suggestion that in accepting the employment he was

representing her in any way other than in his professional capacity. The occupation of a lawyer is not confined to appearances for parties in actions in courts of justice. A very large part of the professional work done by them consists in advice given to clients for the general purpose of aiding them in the conduct of their business affairs. At the time of these transactions Mrs. Jenkins was consulting Mr. Soale concerning a proposed action at law, and it appears that she consulted him about her other business affairs indiscriminately and without any attempted classification of the transactions as being partly within and partly without the scope of his professional business. She was entitled to believe that she was under his care as a counselor employed by her. The fact that in this particular transaction he did not enter any fee charges against her does not change the situation at all, for he was entitled to charge such fees if he so desired. We conclude, therefore, that she did repose confidence in him as her counselor at law, and the only remaining question is as to whether or not he maintained inviolate that confidence. The phrase, ''maintain inviolate the confidence,'' as contained in section 282 of the Code of Civil Procedure, is not confined merely to noncommunication of facts learned in the course of professional employment; for the section separately imposes the duty to ''preserve the secrets of his client.''

Appellant contends that under the evidence in this case it appears that he did not intend to wrong Mrs. Jenkins or to defraud her in any way in the trade, and that even if false representations and concealments occurred which are chargeable against him, no cause of action has been established, since the stock was in fact worth the four thousand dollars which it cost her. Some of the circumstances involved, to which we have referred, tend to show that the accused secretly treated as his own property which, by his advice and pursuant to a plan conceived by him, she was induced to transfer to a third person without knowledge of the fact that in reality her property was passing into appellant's hands. The court was entitled to believe, and did believe, these to be the facts; and this being so, the conclusion is clearly warranted that he considered the transaction as one favorable to himself, and to which he believed that she would not consent if she had known his real interest therein. Under these circumstances, it should be determined that a lawyer is violating

the confidence of his client, even though in its ultimate result the transaction does not lead to a substantial financial loss on the part of the client. In order to sustain an accusation in a disbarment proceeding in a case of this character, it is not necessary to establish all of the facts with reference to the ultimate loss on the part of the client which might be necessary in an action brought by her against him for damages on account of the alleged deceit.

Our conclusions, as above stated, are sufficient to require us to sustain a judgment removing or suspending the accused from the right to practice his profession. We have to consider further only the claim that the court exceeded its authority by rendering an indefinite and uncertain judgment suspending the accused not only for one year from the date of the judgment, but also "thereafter until the claim of the accuser, Grace A. Hilborn, against said accused is fully paid." The court found that all of the allegations of the accusation are true. One of those allegations was that the four thousand shares of stock were worthless. It was also alleged, and the evidence shows without question, that the value parted with by the accuser amounted to four thousand dollars. It was held by the supreme court of California in the only decision which covers the question that in a disbarment proceeding the accused might be suspended for a period not necessarily limited as a fixed and determinate period of time, but could be for an uncertain time, subject to the right of the accused to relieve himself therefrom by making restitution of a stated amount of money which he had improperly obtained by means of his professional misconduct. (In re Tyler, 78 Cal. 307, [12 Am. St. Rep. 55, 20 Pac. 674].) In that case the record showed the amount as established by another judgment, and the judgment of suspension was not subject to attack by reason of any uncertainty in the amount which the accused was required to restore. Following that decision, we think the judgment in the case at bar should be sustained in the form in which it was entered, unless it requires to be modified on account of uncertainty in its statement of the amount of the claim of the accuser. If the evidence is sufficient to show that the stock was worthless, that amount would be four thousand dollars, with interest. The record herein shows that at some time the accuser obtained a judgment against Soale by reason of these same transactions, but that judgment

is not before the court and we do not know either its date or the amount to be recovered as specified therein. We think that the evidence in this case is insufficient to prove that the stock was worthless. That being so, the amount of the claim referred to in the judgment is not ascertained, and the above-quoted final clause thereof is too uncertain to be capable of enforcement.

It is ordered that the judgment herein be modified by striking therefrom the words, "and thereafter until the claim of the accuser, Grace A. Hilborn, against said accused is fully paid." As thus modified the judgment is affirmed.

James, J., and Shaw, J., concurred.