[L. A. No. 18420. In Bank. Dec. 2, 1942.]

ROBERT H. WALLIS, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Robert H. Wallis, in pro. per., for Petitioner.

Jerold E. Weil for Respondent.

THE COURT.—The Board of Governors of The State Bar has recommended that the petitioner be suspended from the practice of law because, in borrowing money from a former client, he committed acts involving moral turpitude and dishonesty. In his petition to review this determination, the petitioner charges generally that the evidence is insufficient to sustain the findings against him. He maintains that his difficulties are the outcome of unprofitable business ventures undertaken in good faith which do not come within the purview of the State Bar Act. (Ch. 4, Bus. & Prof. Code.)

The complaining witness, Mrs. Louise W. Barker, beginning in the year 1937, engaged in the real estate business in Los Angeles County. In March, 1938, she retained Wallis to bring a quiet title action for her. Her husband died in December, 1938, and she received $2,500 from insurance policies upon his life.

Mrs. Barker told Wallis that she had this money and, in the spring of 1939, she came to his office at his request. He asked her for a loan, promising to repay it from fees to be allowed him from an estate then in probate. She loaned him $600 and he delivered to her his promissory note for $700, with interest at 6 per cent. The petitioner has paid $650 on this note and acknowledges that he owes the balance of principal and interest, but he asserts that the estate is not yet closed and he is now unable to pay the balance.

In the summer of 1939, Wallis again asked Mrs. Barker to come to his office. He told her that he and his brother had an opportunity to make a good investment by buying a newspaper in Utah, but that he needed money for that purpose. As collateral for a loan to be made by her, he said that he would pledge shares of stock in the corporation which they desired to purchase. Upon these representations, Mrs. Barker loaned him $1,375, taking his note for $1,675. He delivered to her 37 shares of the stock as collateral security for the indebtedness.

It appears from the evidence that Wallis and his brother

bought the corporation which owns the paper for $11,000 and that they paid $3,000 down, agreeing to pay the balance in annual installments of $1,000. By the contract of sale, they were required to mortgage the assets of the newspaper to secure the unpaid balance of the purchase price. The publishing company had 200 shares of stock outstanding; these the brothers equally divided. The 37 shares pledged as collateral for the repayment of the loan to Mrs. Barker came from the 100 shares which were issued to the petitioner. He made three monthly payments of $50 each. Upon default, Mrs. Barker advertised for sale the pledged stock and, as there were no other bids, she purchased the 37 shares for $10.

In September, 1939, Wallis again requested Mrs. Barker to come to his office. This time he told her that, for $1,000, he would sell her an interest in an approved claim of $7,600 against a bankrupt corporation in which he owned a one-half interest. The Exeter Oil Company, Ltd., had purchased the assets of the bankrupt from the receiver and had agreed to pay off this claim, subject to the payment of prior claims.

A written contract was executed by the petitioner and Mrs. Barker whereby in consideration of the latter's payment of $1,000, Wallis agreed that she should "hold title in her name to the said one-half interest in said claim, until she has received payment in the sum of $1200.00, and thereafter said sums received from or by virtue of said claim [is] to be divided equally" between them. In November, 1939, Wallis told Mrs. Barker that if she would let him have $350, he would give her his remaining interest in the claim. Mrs. Barker accepted his proposition, and Wallis gave her the following memorandum: "Nov. 2, 1939. Rec'd of Mrs. Louise Barker $350/00 to cover purchase of an additional one-fourth interest in Exeter Oil contract. [signed] Robert H. Wallis."

Three days prior to the formal execution of the original contract, Wallis had secured a written assignment to Mrs. Barker of one-half of the claim from the record owner of it. The petitioner did not, however, notify the Exeter Oil Company, Ltd., of the assignment until after the disciplinary proceedings were instituted against him. The record shows a letter from the corporation stating that the assignment has been placed of record with it and that no intervening assignments have been made to its knowledge since September, 1939. The letter concludes: "We cannot offer any encouragement for payments on the unsecured claims for some time as there

is considerable money to be paid on the preferred or secured claims."

In December, 1939, Wallis secured another loan of $265 from the complaining witness. He gave her a receipt for the money reading: "Jan. 5, 1940 This will acknowledge receipt of $265.00 loaned to me by Mrs. Louise Barker on December 13th 1939, in connection with escrow or sale of lots, to be returned to her upon the close of escrow with 1/2 of my profit. [signed] Robert H. Wallis." Wallis used this $265 as a down payment on two lots at a purchase price of $500 each, agreeing to pay the balance within 60 days. The vendor is a friend of the petitioner and has granted Wallis numerous extensions of time to complete the payments. The last extension appears to have given him about a month beyond the date of last hearing before the local administrative committee, within which to complete the purchase.

Although from the testimony in the record it appears that, before making the $265 payment on the lots, some of them had sold for as much as $2,000, and there was a "fair amount" of selling activity in the subdivision at the time of the petitioner's payment, only a few lots have since been purchased. The chief reason for this, according to the owner of the subdivision, is because of certain difficulties which were encountered in obtaining F. H. A. loans.

The testimony concerning the petitioner's representations at the time Mrs. Barker made this loan is conflicting. She testified that Wallis "told me that he had a bunch of lots to get out of escrow . . . and that he needed $265.00 to do it. He told me if I wanted to lend him this $265.00 he was going to make quite a bit of profit out of them and that he would give me half of his profit. He didn't tell me the number of the escrow or anything about it; that it would be a good profit and they were going to be sold at once."

Wallis denied Mrs. Barker's statement that he said the $265 would be used to make the last payment on the lots. He also testified that by "escrow" he meant the contract which the owner of the subdivision had with a bank. According to his explanation he intended to sell the lots and, under the practice of the subdivider, title to the property would come from the bank. The owner of the subdivision testified that when a lot was sold, he would "make the demand upon the [bank] to reconvey to myself and [my wife] and I have always deeded the property to the purchaser."

Upon this showing, the local administrative committee concluded that Wallis, in his dealings with Mrs. Barker, was guilty of acts involving moral turpitude and dishonesty, and, ". . . in the manner in which he carried on business relations with her and borrowed funds from her and made representations to her, violated article 6 of section 6106 of the State Bar Act'' and also violated his oath as an attorney. The committee voted for disbarment. But when the matter came before the Board of Governors, it omitted certain findings and added one reading: ''From the time of respondent's employment by said Louise W. Barker as an attorney in 1938 and continuing at all times mentioned herein a relation of confidence existed between respondent and the said Louise W. Barker.'' Upon the findings as modified, it recommended that Wallis be suspended for six months, declaring that it took into consideration his past record, which included a private reprimand administered on September 16, 1933.

Wallis contends that the evidence produced before the local committee is insufficient to sustain any of the charges set forth in the complaint or the findings of fact. He asserts that he dealt with Mrs. Barker not as her attorney but at arm's length, and that his failure to pay the money owed was solely because he lacked funds to do so. And although he admits that the collateral which he put up for the loan of $1,375 has no market value, the publishing company, so he asserts, is solvent and ultimately its stock will be valuable. He takes the position that he never intended to avoid paying the debts and has acted in good faith throughout.

The petitioner also attacks the recommendation against him on many other grounds. He never advised Mrs. Barker to make any investments, he declares, and she received the publishing company's stock as security for a loan. He states that his failure to transfer to her the interest in the claim against the oil company was due to inadvertence, and although he may have exercised poor judgment in purchasing the lots, he acted in good faith. And he contends, ". . . the mere fact that one party to a transaction has confidence in another does not, as a matter of law, create the relationship of guardian and ward, or permit one party to shirk his duty to exercise his own independent judgment and to use reasonable means to secure such information as may be necessary for that purpose.''

Section 6106 of the Business and Professions Code provides: ''The commission of any act involving moral turpitude,

dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise . . . constitutes a cause for disbarment or suspension." Moral turpitude, as defined by Bouvier, and this court comprises "everything done contrary to justice, honesty, modesty, or good morals." (*Lantz* v. *State Bar*, 212 Cal. 213 [298 P. 497]; *Matter of Coffey*, 123 Cal. 522 [56 P. 448].)

So far as the loan of $600, and the sale of the petitioner's interest in the approved bankruptcy claim are concerned, no evidence of misrepresentation or dishonesty on the part of Wallis appears. And although he neglected to forward the assignment in favor of Mrs. Barker to the oil company which had bought the debtor's assets, it appears that her rights were not prejudiced by the delay.

The evidence as to the petitioner's statements when he obtained the other two loans places him in a more unfavorable light. Apparently he believed that the stock of the corporation which owns the Utah newspaper was a sound investment; at least he claims to have invested his own funds in it. And according to a banker in the town where the newspaper is published, the assets of the corporation have increased from a value of $11,000 at the time the petitioner and his brother purchased them to $14,000 at the date of the hearing before the local administrative committee. In the same period the paid subscriptions increased from 500 to 1,300. Two of the annual payments of $1,000 have been made to the seller. But, according to Wallis, because of the necessity of purchasing additional machinery costing $2,000 the earnings have not been sufficient to enable him and his brother to meet the $50 monthly payments to Mrs. Barker.

Mrs. Barker testified that the petitioner told her "the stock would be of very much more value than the money that would be owing to me; that it was perfectly safe and he wouldn't have me lose a dime for anything . . . he told me that the stock that I held as collateral was far in excess of the money that I was lending him. He also told me that I could dispose of it at any time and realize my money." The petitioner denied having told Mrs. Barker that she could sell the stock anywhere "and it wasn't on the strength of what the stock might be sold for in the open market that these loans were made. . . . I did tell her at all times that it was a good investment that I was going into but I never tried to sell her on any investment." He also denied having discussed the market

value of the stock but, in his words, "told her there were enough assets back of it to warrant the amount of the pledge." These representations, the Board of Governors found, were not warranted by the information which Wallis had at the time they were made. But assuming that the evidence supports this finding and that, in a civil action for fraud, Mrs. Barker would be entitled to a judgment under the rule stated in section 1572 of the Civil Code, it does not justify disciplinary action. Representations which may be legally characterized as amounting to "moral turpitude, dishonesty or corruption" must be made with an intend to mislead.

Whether the petitioner deliberately misstated the use to which he would put the $265 depends, to a considerable extent, upon the meaning of the word "escrow" as used by the petitioner. Mrs. Barker testified that Wallis told her the $265 was to be used as a final payment in an escrow. Wallis testified: ". . . when the $265.00 was borrowed from Mrs. Barker, I didn't tell her I had a bunch of lots in escrow; I said I had a chance to get them out of escrow and if she would loan me $265.00 whatever I sold the lots for she would have [one-half] the profit. . . . [The subdivider] had an escrow with the Security Bank on the bunch of I think two hundred lots . . . and as they were sold the bank would release them." The wording of the receipt given Mrs. Barker by the petitioner, stating that the $265 was loaned to him "in connection with escrow or sale of lots, to be returned to her upon close of escrow with 1/2 of my profit" is more consistent with the petitioner's version of the transaction than with the testimony of the complaining witness. For if, as she stated, the $265 was to be the final escrow payment, there could be no profit at that time "to be returned to her upon close of escrow." It may be noted that Mrs. Barker had, prior to this time, engaged in the real estate business for over a year. Yet she states that she did not inquire as to where the escrow was carried, or anything concerning the transaction.

The State Bar relies upon *In re Soale*, 31 Cal.App. 144 [159 P. 1065], and *Lantz v. State Bar, supra,* as justifying its recommendation for suspension. In each of these cases the wrongful conduct of the attorney resulted in loss to a woman who had retained him to manage her business affairs. But in the present proceeding, the charges against the petitioner are not based upon any wrongful act committed in connection with a business transaction he was handling for Mrs. Barker. In all of the matters of which complaint is

made, Wallis directly solicited loans for himself as a principal.

That Wallis was using money he had borrowed from Mrs. Barker to finance his business deals may not be questioned. Certainly, under the circumstances shown in this case, his conduct in borrowing money from his former client is not to be commended. On the other hand, although Mrs. Barker testified that she had confidence in Wallis and so informed him, she also very frankly stated that she would not have loaned money to him if he had not promised to pay her the bonuses which she exacted from him.

The situation then is one where a lawyer apparently attempted to augment his professional income by engaging in business transactions which were highly speculative, and beyond his ability to fairly appraise or successfully carry out. He interested the complaining witness in these ventures by promising her more profit than a prudent investor would expect. The inevitable result is unfortunate for both of them but, for the reasons which have been stated, his conduct does not justify disciplinary action under the State Bar Act.

The charges against the petitioner are dismissed.