[L. A. No. 23205.   In Bank.   Oct. 29, 1954.]

ARNOLD DAVID KRIEGER, Petitioner, v. THE STATE
BAR OF CALIFORNIA, Respondent.

Arnold David Krieger, in pro per., and Bernard Brennan for Petitioner.

Garrett H. Elmore for Respondent.

THE COURT.—The local administrative committee of The State Bar in Los Angeles recommended that the petitioner be disciplined for violations of sections 6067, 6068, 6103 and 6106 of the Business and Professions Code by suspension from practice for a period of 90 days. The Board of Governors adopted the findings of the committee but has recommended suspension for two years, taking into consideration a public reproval by the board in 1950, the nature of petitioner's conduct, and the severity of the loss sustained by his client through his misconduct.

Petitioner is 56 years old. He was admitted to practice law in this state in 1932. He represented Mr. and Mrs. Schmidt in various legal matters prior to Mr. Schmidt's death in 1951. He thereafter represented Mrs. Schmidt in the probate of her husband's estate. After the estate was closed Mrs. Schmidt was absent from the city for about seven

months. Upon her return she made an appointment to see petitioner on or about November 2, 1952, with regard to insurance and delinquent payments on property she owned. In particular she asked him whether she should pay off the balance on a certain mortgage. He asked her how much she owed, how much money she had in the bank and what interest she was drawing on it. She replied that she had $18,000 cash. He stated that he knew of a better investment for her and suggested that instead of paying off the mortgage she invest $10,000 in the Gerapaul Company, a partnership composed of himself and his wife and another couple, the Flormans.

According to the testimony of Mrs. Schmidt at the disciplinary proceedings the petitioner told her that the Gerapaul Company was in the business of buying and selling buildings. Actually it was in the business of financing paper on second-hand automobiles. The automobiles sold were owned by McGaffey Motors, a company in which petitioner was an officer, and 50 per cent of the stock of that company was owned by the Gerapaul Company. Mrs. Schmidt did not ask about the financial status of the company other than to ask if it was a good investment for her and if she could get the money any time she needed it. She testified that he reassured her as to these questions several times during the conversation. He did not volunteer any information about the company's financial status at that time. Such information would have disclosed that the company had been in existence only since June, 1952; that the partners had only $4,000 capital invested; that $25,000 had been invested by a Mrs. Matsner (also a client of petitioner) either as a "silent partner" or as a "creditor"; and that the company was in no position to pay 10 per cent interest on any investment. These facts were within petitioner's superior knowledge. Mrs. Schmidt was a widow with little business experience. She consulted him because he was her attorney and she considered him to be a responsible person. He did not advise her to consult anyone else before deciding. She relied upon his assurances that it was a good investment "for her" and that she could have her money back when she needed it.

Mrs. Schmidt did not have her bankbook with her on November 2, 1952. Petitioner told her to make her check out to the Gerapaul Company and mail it in. The company's address was the same as that of petitioner and Mr. Florman, an accountant, his partner. She did not ask for or receive

any statement in writing evidencing the terms of the transaction. She mailed the company two checks totaling $10,000 dated November 10, 1952, and this amount was credited to her on its books. On December 12, 1952, and January 13, 1953, respectively, she received checks of $63.33 each, representing interest at 10 per cent per annum.

Meanwhile and at some time prior to December 24, 1952, Mrs. Schmidt was advised by Mr. Edward Levi, who handled her accounting matters, to request the return of her money. Levi had known both parties for many years. Her story was to the effect that when Levi checked her bank account for income tax purposes he discovered the two canceled checks; that he made some inquiries about the company and talked to petitioner; and that Levi advised her that the petitioner said he would return the money if she would write him a letter requesting it. She wrote such a request on December 24th. She testified that the petitioner thereafter promised her at various times to return certain sums on specific dates but that in each instance he failed to do so. In February, 1953, she first complained to The State Bar about the matter.

A preliminary committee hearing was held prior to July 7, 1953. On that date a settlement was reached between petitioner, Mrs. Schmidt and Mr. Levi under the terms of which she was to receive a $10,000 note coexecuted by McGaffey Motors and petitioner, secured by 50 shares of McGaffey Motors stock and certain shares (not yet issued) of Las Ondas Café, Inc. stock; also, she was to receive 10 $50 checks signed by McGaffey Motors in payment of back interest due her, payable one every week or 10 days until all the back interest was paid up, and she was to receive interest every month in the future. She was also to receive substantial payments on the note to clear it up within a year. She and Levi thereupon signed a letter prepared by petitioner directing The State Bar to dismiss the proceedings.

Mrs. Schmidt received the note, the McGaffey stock and the 10 $50 checks. The Las Ondas Café stock was never issued and that company is now apparently bankrupt. No payments had been made of interest or principal on the note as of the date of the hearings, which concluded December 8, 1953. She did not present any of the $50 checks for payment. The reason for this is not clear. There is some evidence in the record to the effect that she was told not to cash them by the attorney for The State Bar, but no explanation is given why she had not presented any of them for payment before such advice

was purportedly given to her. Shortly thereafter the principal assets and liabilities of the Gerapaul Company were transferred to McGaffey Motors. Petitioner's testimony as to the financial status of either company was vague and inconclusive. He could not recall the net value of the assets transferred; did not know the net worth of the company at the time the transfer was made; and he had no financial statements to offer except one prepared December 31, 1952, by his partner. This statement was unverified and was, he claimed, erroneous in showing Mrs. Matsner as a "limited partner" with a capital investment of $25,000. No certificate of limited partnership was filed as required by the Limited Partnership Act (Corp. Code, § 15502) and some question of violation of the Corporate Securities Act (Corp. Code, § 25100, subd. (m)) may have been presented. However, petitioner testified, and other evidence would appear to support his testimony, that Mrs. Matsner was a creditor instead of a limited partner.

The evidence indicates that at or about the time of Mrs. Schmidt's investment in the company, or before December 31, 1952, petitioner and his partners got their own money ($4,000) out and avoided out-of-pocket loss while offering Mrs. Schmidt small monthly interest checks. They repaid Mrs. Matsner, whose loan had been made some three and one-half months previous to that of Mrs. Schmidt, the sum of $5,600 capital, plus $966.66 as her share of the earnings. Prior to the close of the hearings they paid Mrs. Matsner an additional $11,000 of her investment, apparently in settlement of a suit she had instituted against the company. Petitioner's testimony that at the date of the investment by Mrs. Schmidt the company appeared to be a responsible company "with a 2 to 1 ratio of assets over liabilities" is not borne out by the evidence. Nor does there appear to be any substantial support in the evidence for his contentions that her money immediately began earning a profit far in excess of 10 per cent; that it was comparatively easy to meet the interest payments; that payments of such interest only stopped by reason of the disciplinary proceedings; and that it was her demand for the return of her money which caused the consolidation of the Gerapaul Company and McGaffey Motors.

The committee concluded that by his acts the petitioner had violated his oath and duties as an attorney and had committed acts of professional misconduct, and particularly that he had committed acts involving moral turpitude and dishonesty in soliciting a $10,000 investment from his client

without disclosing the pertinent facts in his possession concerning the Gerapaul Company in which he was financially interested. He did not ask for a hearing in the proceeding before the Board of Governors, and the board adopted the findings and conclusions of the committee.

Petitioner contends that the findings and conclusions of the board are contrary to the evidence. It is true that there are two minor inaccuracies in the findings. Neither of these affects the result. ▋ That portion of Finding VIII which states that "after Lucy A. Schmidt had several times demanded the return of her money respondent finally advised her and Edward Levi that The Gerapaul Co. was a partnership in which [he] was a partner" is without support in the record. However, it was not the fact that he was a partner in the company at the time he recommended the investment to his client which of itself made his conduct censurable. His active misrepresentation and concealment of the true nature of an investment which he, as an attorney, recommended to his client, constitute dishonesty and moral turpitude which make him subject to disciplinary action.

▋ Likewise immaterial is a discrepancy in dates appearing in Finding II, which states that the date on which the petitioner recommended the investment to his client was "on or about November 12, 1952" and in Finding III, which states that "thereafter" Mrs. Schmidt forwarded her checks. The record supports petitioner's statement that this date was November 2, 1952, but does not otherwise indicate any prejudice suffered by petitioner as a result of this misstatement as to the date.

The petitioner attempts to show dehors the record that this discrepancy is important, and that it is material as to the question whether Mrs. Schmidt relied upon his advice or made an independent investigation before forwarding her checks on November 10th. He has attached to his petition for review in this court two exhibits, one a Dun and Bradstreet report dated November 6, 1952, on the Gerapaul Company; the other a copy of a receipt signed by his attorney for documents which were turned over to him by The State Bar after the Board of Governors adopted the findings of the local committee. ▋ Petitioner contends that the receipt shows that this report was known to The State Bar and was wrongfully withheld from consideration at the hearings. This report is not part of the record and is not therefore a proper matter for consideration by this court. It is observed, how-

ever, that the report does not indicate by whom it was obtained or when any of the parties first became aware of it. More important, the financial data indicated therein is in conflict with the financial statement prepared by Mr. Florman and furnished to the committee by petitioner. Also, the report states that it is based on data furnished by petitioner. If his client actually did obtain the report she would have been misled by the information therein contained, and would not have been advised as to the true financial condition of the company. Petitioner did not cross-examine either Mrs. Schmidt or Mr. Levi on the question whether they had made any independent investigation prior to making the investment, and he did not present any such defense. He admitted throughout the proceedings that an attorney-client relationship still existed between himself and Mrs. Schmidt. The burden was upon him to show that the transaction between them was "at arm's length." He may not now bring in new evidence when he did not present his entire defense before the trial committee and when he failed to request a hearing before the Board of Governors. (*Shaeffer* v. *State Bar*, 220 Cal. 681, 687 [32 P.2d 140].)

Petitioner contends that moral turpitude cannot be predicated upon errors of judgment made in good faith by an attorney. In view of his superior knowledge of the condition of the Gerapaul Company at the time he suggested to Mrs. Schmidt that it would be a better investment for her than paying off her mortgage, it was his duty to disclose such facts to her even in the absence of an attorney-client relationship. (*Cf. Bagdasarian* v. *Gragnon,*. 31 Cal.2d 744, 748 [192 P.2d 935].) The evidence would support an implied finding that he acted in bad faith in recommending the investment, at a time when the company in which he was interested needed cash to meet the demands of Mrs. Matsner and that shortly thereafter substantial sums were paid to her and to the partners. Whether or not there was actual fraud there was misrepresentation and concealment of adverse and material facts. There was more involved than merely "guessing wrong" as to the future of the used car business.

Petitioner relies strongly upon *Wallis* v. *State Bar*, 21 Cal.2d 322, 329 [131 P.2d 531], in which an attorney interested a former client in highly speculative transactions by promising her more profit than a prudent investor would expect, and his conduct was held not to justify disciplinary

action under the State Bar Act. In each of the matters there concerned, the attorney directly solicited funds for himself as a principal and did not recommend any investment; his client had previous business experience; and she did not suffer serious loss. More important is the fact that the loans were advanced by the client only because the attorney promised her certain bonuses which she exacted from him. Here the inducement would appear not to be the 10 per cent profit promised but the assurances, repeated during the conversation on November 2, 1952, and thereafter, that it was a good investment for Mrs. Schmidt and that she could get her money when she needed it.

The remaining question is the degree of discipline recommended. The State Bar cites numerous cases in support of its contention that where an attorney has abused the confidence of his client the court has adopted the drastic measure of disbarment. (*Roark* v. *State Bar,* 5 Cal.2d 665 [55 P.2d 839]; *Laney* v. *State Bar,* 7 Cal.2d 419 [60 P.2d 845]; *Stanford* v. *State Bar,* 15 Cal.2d 721 [104 P.2d 635]; *Yale* v. *State Bar,* 16 Cal.2d 175 [105 P.2d 112].) Petitioner argues that he was not entrusted with funds as a trustee, nor with the management of the client's property, and that he did not misappropriate funds. The record indicates that he obtained $10,000 for an enterprise in which he and his partners were interested by affirmative misrepresentation and concealment of the true condition of the concern, and that the loss to her is just as great as if he had misappropriated it.

In fixing the degree of punishment recommended, the Board of Governors took into consideration the fact that the petitioner did nothing for several months after the original transaction, aside from the payment of the first two months' interest; that it was only after a preliminary disciplinary hearing that the McGaffey Motors transaction was completed; and that in the meantime substantial withdrawals had been made by others.

The recommendation of the Board of Governors is approved, and the petitioner is suspended from the practice of the law in this state for the period of two years commencing 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied November 24, 1954.