[L.A. No. 32089. Dec. 19, 1985.]

JACK RITTER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

596

COUNSEL

Peter R. diDonato for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Ellen A. Pansky, Lynne Geminder and Arthur Margolis for Respondent.

OPINION

**THE COURT.***—This is a proceeding to review the recommendation of the State Bar that petitioner, Jack Ritter, be suspended from the practice of law for three years, that execution of the suspension be stayed and that he be placed on probation for three years. The recommended conditions of probation include actual suspension for 60 days.

### I.

On June 11, 1981, petitioner was charged with violating his oath and duties as an attorney (Bus. & Prof. Code, §§ 6067, 6068, and 6103),[1] committing acts involving moral turpitude and dishonesty (§ 6106), and acquiring an interest adverse to a client under terms which were not fair and reasonable without giving the client a reasonable opportunity to seek the advice of independent counsel on the transaction (rule 5-101).[2]

---

*Before Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., Lucas, J., Park, J.†

[1] Unless otherwise noted, all statutory references are to the Business and Professions Code. All references to rules are to the Rules of Professional Conduct.

[2] Rule 5-101 provides: "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto."

†Assigned by the Chairperson of the Judicial Council.

Following a hearing, the panel sustained only the rule 5-101 allegation. The panel recommended that petitioner be privately reproved and that for a period of three years petitioner not enter into business transactions with clients without first submitting written documents evidencing the transaction to a State Bar probation monitor. Neither petitioner nor the State Bar sought review of the hearing panel's decision.

Nevertheless, the review department, on its own motion, set the matter for hearing. After the matter was submitted, the review department unanimously adopted the hearing panel's findings with one minor deletion and one addition. By a closely divided vote, the review department recommended more severe discipline than that recommended by the hearing panel. (See *ante,* at p. 598.)

## II.

Petitioner was admitted to the practice of law on December 18, 1957. He has been disciplined on one prior occasion for negligently supervising disposition of client trust funds and failing to promptly pay out funds which his clients were entitled to receive. That misconduct, which occurred in mid-1976, resulted in a six-month suspension with execution of the suspension stayed upon certain conditions including eighteen months probation.

The present allegations of misconduct arose out of a loan which petitioner's clients, Pauline and Bill Hollar, made to petitioner in December of 1978.

Petitioner and the Hollars have known each other since the early 1970's. They are members of the same religious congregation. Prior to 1978, they saw each other two or three times a week.

In August of 1975, Ms. Hollar retained petitioner to represent her in a medical malpractice action. She signed a retainer agreement which provided that petitioner would receive 40 percent of any recovery obtained or negotiated within 30 days of the date of trial.[3]

In March of 1976, petitioner retained an investigator in the case. Ms. Hollar signed an agreement which provided that she would pay the investigator 10 percent of any recovery in the malpractice matter.

Trial was set to begin in November of 1978. The matter trailed for five or six weeks. During that period, petitioner conducted settlement negotiations with the defendants and eventually reached a settlement of $80,000.

---

[3]Petitioner was to receive one-third of any settlement negotiated 30 days *prior* to trial.

Approximately one week before the case finally settled, petitioner offered to modify the original retainer agreement so that the Hollars would receive a greater recovery. In return, the Hollars were to lend petitioner their portion of the settlement. Over the next several days, petitioner and the Hollars discussed the terms of the loan.

During these discussions, petitioner told the Hollars that the loan would be made to Law Office Management, Inc. (LOM), an entity which petitioner controlled. LOM owned "the equipment and everything" in petitioner's office. LOM contracted with business associations whereby LOM would obtain the services of attorneys who were willing to represent members of the associations in legal matters. Petitioner explained to the Hollars that the loan would be used to help expand LOM's business. Petitioner did not advise the Hollars of LOM's financial condition nor did he provide them with any of its financial statements.[4]

The malpractice suit was settled in late December of 1978. Under the original retainer agreement, the Hollars were to receive $36,000 after costs and fees were deducted.

On the day of or shortly after the settlement, the Hollars signed an "investment agreement" with petitioner. That agreement modified the original retainer agreement, reducing attorney fees from $32,000 to $10,000 and investigator fees from $8,000 to $6,000.[5] The Hollars' share of the settlement was thus increased from $36,000 to $60,000.[6] Under the investment agreement, the Hollars loaned the $60,000 to LOM at 3 percent interest per annum for five years.[7] The loan was to be repaid in 60 equal monthly installments. The loan was unsecured and personally guaranteed by petitioner.

At the same time the investment agreement was concluded, the Hollars informed petitioner that they needed "at least a couple thousand dollars." Petitioner gave them $5,000 and drew up a one-page modification to the

---

[4]The record is unclear as to LOM's financial condition at the time of these discussions. Petitioner testified that LOM's liabilities were "very little" and that as of June 30, 1979, LOM had outstanding loans of approximately $155,000.

[5]The costs apparently remained at $4,000.

[6]The record is somewhat confusing as to the amount the Hollars were to receive under the original retainer agreement. At one point in his testimony, petitioner stated that the amount was $38,000. At another, he testified that the Hollars were to receive $24,000 more under the modified agreement as a result of the reduction of attorney and investigator fees. This would mean that the Hollars were originally supposed to receive $36,000.

[7]Since the Hollars were receiving an additional $24,000 from the settlement, petitioner suggested that the interest rate on the loan should be less than the prevailing rate. Petitioner recommended the 3 percent rate the church used in repaying loans to its members. The Hollars agreed.

investment agreement. The modification reflected the $5,000 payment and stated that payment of that sum represented the first five payments under the investment agreement.

Although petitioner subsequently fell behind in his loan repayments to the Hollars, he did repay the loan in full within the five-year repayment period.

## III.

At the State Bar hearing, the State Bar examiner was permitted to read into evidence a portion of Ms. Hollar's deposition testimony, based on the hearing panel's finding that she was unavailable. Petitioner contends that this procedure violated due process and his right to confrontation.

Code of Civil Procedure section 2016, subdivision (e)(3) provides that the deposition of a witness may be used by any party for "any purpose" if the court finds that the witness is "unavailable" within the meaning of section 240 of the Evidence Code. Declarants who are "unable to attend or to testify at the hearing because of then existing physical or mental illness or infirmity" are considered "unavailable." (Evid. Code, § 240, subd. (3).)

At the June 15th hearing, the State Bar examiner indicated that Ms. Hollar's deposition would be offered in lieu of her live testimony because she was ill. The hearing panel then granted a continuance to permit the examiner to obtain a doctor's letter to that effect.

On the next scheduled hearing date, the examiner provided the panel with a doctor's letter indicating that Ms. Hollar was suffering from obstructive arterial disease, coronary ischemia, and severe asthma. The letter was dated approximately two months prior to the hearing date and stated that "it [was] not medically advisable for [Ms. Hollar] to appear in court as she cannot tolerate stress of any kind." Thereafter, over objections that no proper foundation as to unavailability had been established and that petitioner would be denied his constitutional right to cross-examine an adverse witness, the hearing panel admitted portions of the deposition into evidence.

As the State Bar concedes, this was error. The letter was insufficient to establish unavailability under Evidence Code section 240. Ms. Hollar was the individual who had initiated the disciplinary proceeding against petitioner. She was expected to be the State Bar's chief witness. Therefore, the hearing panel should have required a more reliable and timely showing of unavailability before admitting the deposition testimony.

However, the error was harmless. Mr. Hollar testified at the hearings and provided evidence of the events in question independent from that provided

by his wife. Since his testimony adequately supports the State Bar's findings, no relief on this ground is warranted.

 Petitioner next contends that he did not violate rule 5-101. He first claims that the terms of the transaction entered into with the Hollars were fair and reasonable and were fully disclosed in writing in a manner reasonably understood by them. (See rule 5-101(1).) This court need not address this issue since the hearing panel made no written finding to the contrary.[8]

The hearing panel did find, however, that petitioner failed to advise and to give the Hollars a reasonable opportunity to seek the advice of independent counsel. (See rule 5-101(2).) Since the review department adopted the hearing panel's findings and made no further finding on the issue, this is the only finding that must be addressed.

Rule 5-101(2) requires that "the client [be] given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction." Although petitioner acknowledges that he may have violated rule 5-101, he contends that his violation was only a "technical" one. This argument is without merit.

 The "relationship between an attorney and client is a fiduciary relationship of the very highest character. All dealings between an attorney and his client that are beneficial to the attorney will be closely scrutinized with the utmost strictness for any unfairness." (*Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 146 [77 Cal.Rptr. 657, 454 P.2d 329]; *Marlowe* v. *State Bar* (1965) 63 Cal.2d 304, 308 [46 Cal.Rptr. 326, 405 P.2d 150]; *Magee* v. *State Bar* (1962) 58 Cal.2d 423, 430 [24 Cal.Rptr. 839, 374 P.2d 807].)

 To ensure the fairness of such dealings, it is incumbent upon the attorney entering into such transactions to advise the client to seek independent counsel. The failure to do so constitutes a violation of rule 5-101.

Petitioner concedes that he violated rule 5-101 by failing to advise the Hollars to discuss the loan proposal with anyone. However, petitioner also violated that rule by failing to give the Hollars a "reasonable opportunity" to do so.

Mr. Hollar testified that petitioner never advised him and his wife to discuss the loan proposal with anyone. Mr. Hollar also stated that the in-

---

[8]In its oral ruling, the hearing panel initially found that petitioner violated rule 5-101 in that (1) he had failed to provide the Hollars a reasonable opportunity to seek the advice of independent counsel on the transaction, and (2) the terms of the transaction were not fair and reasonable. However, in its written findings issued after the hearing, the panel cited only the first ground.

vestment agreement was signed in petitioner's office within minutes after it was first presented to the Hollars.

However, petitioner insisted that he encouraged the Hollars to talk to anyone they wanted to about the agreement prior to signing it. According to petitioner, in preliminary discussions, the Hollars told him that they intended to discuss the terms with others. Petitioner denied that the written agreement was signed in his office when it was first presented. He insisted that the Hollars took the agreement home and returned it later that day or the following day.

Although there is conflicting evidence as to whether the Hollars were given a reasonable opportunity to seek the advice of independent counsel, Mr. Hollar's testimony supports the hearing panel's finding on this issue. Thus, petitioner has not met his burden of demonstrating that the State Bar findings are not supported by the evidence. (See *Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 12 [206 Cal.Rptr. 373, 686 P.2d 1177]; *Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 121 [202 Cal.Rptr. 349, 680 P.2d 82].)

## IV.

The hearing panel and the review department differed in their recommendations as to discipline. The panel recommended a private reproval, while the review department, in a six-to-five vote, recommended a three-year stayed suspension with three years probation and sixty days actual suspension. The five dissenting members were of the view that the recommended discipline was excessive.

The review department concluded that the increased discipline was warranted in view of petitioner's prior record of discipline and the fact that the rule 5-101 violation was exacerbated by petitioner's (1) conditioning the settlement recovery upon Ms. Hollar's agreement to enter into the loan transaction, (2) offering a very low interest rate in the transaction, and (3) failing to offer any security for the loan.

Petitioner contends that the review department's recommendation is excessive. He argues that there is no factual basis to support the first two of the review department's three reasons for increasing the hearing panel's recommendation.

The State Bar offered no evidence that petitioner in any way made the settlement recovery contingent on Ms. Hollar's agreement to enter into the loan transaction. Mr. Hollar's testimony that petitioner placed no such con-

dition on the transaction directly contradicts the review department's finding on this point.

In addition, the review department's focus on the 3 percent interest rate paints an incomplete picture. That asserted low rate of return—to which the Hollars agreed—must be understood in the context of the entire transaction. In addition to the interest the Hollars were to receive, which over the term of the agreement amounted to some $4,000, they were to receive an additional $24,000 in the malpractice settlement. (See *ante,* at p. 600.) This $28,000 increase in the recovery, paid over five years, amounts to an annual rate of nearly 16 percent on the original $36,000—quite different from the "very low rate of return" found by the review department.

Moreover, as Mr. Hollar testified, he believed the transaction was fair and reasonable. There is no evidence that petitioner made any false or misleading statements to induce the Hollars to enter into the transaction, nor does the record disclose that petitioner's actions were made in bad faith or for his personal gain at his clients' expense. It is significant that petitioner repaid the loan in full within the repayment period.

■ Although the review department's recommendation as to discipline is entitled to great weight, the ultimate decision rests with this court. (*Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 916 [180 Cal.Rptr. 831, 640 P.2d 1106]; *Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 513-514 [153 Cal.Rptr. 24, 591 P.2d 47].) "In deciding what discipline is warranted, each case must be decided on its own facts. There are no fixed standards as to the appropriate penalty. [Citations.]" (*Alberton* v. *State Bar, supra,* 37 Cal.3d at p. 14.)[9]

■ In light of the above considerations and in view of the lack of evidence to support two of the review department's reasons for increased discipline, this court concludes that the review department's recommendation is excessive.

However, this does not mean that the hearing panel's recommendation of a private reproval should be followed. Given the clear violation of rule 5-

___

[9]Rule 5-101-type violations have resulted in a wide range of discipline. (See, e.g., *Lewis* v. *State Bar* (1981) 28 Cal.3d 683 [170 Cal.Rptr. 634, 621 P.2d 258] [thirty-day suspension stayed, one-year probation]; *Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465 [169 Cal.Rptr. 581, 619 P.2d 1005] [three-year suspension stayed, three-year probation, thirty days actual suspension]; *Ames* v. *State Bar* (1973) 8 Cal.3d 910 [106 Cal.Rptr. 489, 506 P.2d 625] [private reproval]; *Krieger* v. *State Bar* (1954) 43 Cal.2d 604 [275 P.2d 459] [two-year suspension]; *Wallis* v. *State Bar* (1942) 21 Cal.2d 322 [131 P.2d 531] [charges dismissed].) None of those cases involve rule 5-101 violations based on an attorney's failure to provide his clients with a reasonable opportunity to seek the advice of independent counsel.

101, the failure to offer any security for the loan, and petitioner's prior record of discipline, a one-year stayed suspension with two years probation and 60 days actual suspension is appropriate. Such discipline adequately takes into account the goals of protecting the public and preserving confidence in the legal profession.

## V.

Petitioner's final contention is that the recommended conditions of probation are vague, ambiguous, overbroad, and are not appropriately tailored to correct the misconduct.

Petitioner offers no specific argument on the vagueness and ambiguity claims, and addresses himself only to probation condition number 3. That condition requires petitioner to provide quarterly reports to the State Bar and to certify that he has complied with all provisions of the State Bar Act and Rules of Professional Conduct.

Petitioner argues that such a condition "literally 'set[s] up' [the attorney] for . . . future disciplinary action without appropriate notice, or an opportunity to be heard . . . ." Petitioner asserts that if an attorney unknowingly violates a technical provision of the rules but certifies to the State Bar that he has complied with those rules, the attorney faces revocation of probation and actual suspension without formal procedural safeguards. By imposing this condition, he argues, the State Bar is in effect "sidestepping" its responsibility to independently investigate and prosecute a disciplinary matter, "by merely . . . shifting the burden of proof in disciplinary proceedings onto the attorney to prove that he/she had not violated any ethical regulations by means of a term and condition of probation."

Petitioner's argument does not require extended discussion. The reporting requirement permits the State Bar to monitor petitioner's compliance with professional standards. In light of the present misconduct and his prior record of discipline, the requirement is entirely appropriate.

## VI.

Petitioner is suspended from the practice of law for one year. Execution of the order of suspension is stayed, and petitioner is placed on probation for two years under the conditions of probation specified by the review

department order, including an actual suspension of sixty days. This order is effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied February 20, 1986.