[S.F. No. 25134. Feb. 16, 1988.]

ROBERT L. HUNNIECUTT, Petitioner, v.
THE STATE BAR, Respondent.

**COUNSEL**

Robert L. Hunniecutt, in pro. per., for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., and Richard J. Zanassi for Respondent.

## OPINION

**THE COURT.**—In this proceeding we review the recommendation of the State Bar of California that petitioner Robert Lewis Hunniecutt be suspended from the practice of law for three years, that execution of suspension be stayed, and that petitioner be placed on probation for five years on conditions which include actual suspension for ninety days and until restitution has been made.

The recommendation is based on findings that petitioner abandoned clients in two matters and violated the State Bar Rules of Professional Conduct, rule 5-101,[1] which governs business transactions with clients, in a third matter. Petitioner denies that he violated any duties as an attorney in the third matter, contending that no attorney-client relationship existed at the time of the business transaction. He also asserts that even if such a relationship existed, any violation of rule 5-101 was merely a technical one not involving moral turpitude.

We conclude that an attorney-client relationship existed at the time of the business transaction involved herein, that the transaction was not "fair and reasonable" to petitioner's client, that petitioner's involvement therein constituted an act of moral turpitude within the meaning of Business and Professions Code section 6106, and that the recommended discipline is appropriate.

## I.

Petitioner was admitted to practice law in December 1976. He has not previously been disciplined by the State Bar. The present action arises from his conduct in three separate matters:

---

[1] Rule 5-101 provides: "A member of the State Bar shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the member of the State Bar acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms which should have reasonably been understood by the client, (2) the client is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto." All references to rules herein, unless otherwise indicated, are to the Rules of Professional Conduct.

## A. *The Rosenquist Matter*

In January 1983, Cynthia Rosenquist employed petitioner to assist her in recovering her investment of $3,500 in a company that had become insolvent. Rosenquist relinquished to petitioner all of her documents related to the investment, and in January and February 1983 he made some inquiries on her behalf. He did no further work on the matter, and after February 1983 he failed to return any of her frequent telephone calls or to communicate with her in any way. In August or September 1983, Rosenquist, in an attempt to retrieve her documents, went to the office where she had initially consulted petitioner, but she found the office vacant. She did not hear from petitioner again until after she had contacted the State Bar about her situation.

## B. *The Chang Matter*

In December 1981, Janet Chang employed petitioner to represent her in a dispute with Laura Wong concerning the ownership of a home in San Francisco. In February 1983, Wong filed an action against Chang in San Francisco Superior Court. Petitioner scheduled the plaintiff's deposition for March 1, 1983, in his own office, but failed to appear. He took no further action in the matter, and his client's default was entered. She subsequently employed another attorney and, in September 1983, the default was set aside. The superior court, however, imposed a $1,000 sanction against Chang to compensate Wong for legal fees incurred as a result of petitioner's failure to respond to the complaint in a timely manner.

## C. *The Mitchell Matter*

In 1978, Leolani Mitchell employed petitioner to represent her in a personal injury action. Mitchell had been referred to petitioner by her coworker Robert White, a longtime personal friend of petitioner who was also involved in planning real estate investments with him. Petitioner negotiated a $5,000 settlement on Mitchell's behalf, and in October 1979 he asked White to deliver the settlement funds to Mitchell. At that time, petitioner and White were seeking investors' funds for use in a contemplated real estate transaction. White testified that when petitioner gave him the settlement check to deliver to Mitchell, petitioner asked him to solicit Mitchell for an investment loan for the venture. Petitioner denies having suggested the solicitation of Mitchell at that time.

In March 1980, Mitchell tendered $5,000 to White, who delivered the money to petitioner for investment in the real estate venture. As security for her investment, White gave Mitchell a note and deed of trust he had signed

and which was notarized by petitioner. Although these documents obligated only White to pay Mitchell, petitioner testified at the hearing that he received and spent the funds and that he considered himself ultimately responsible for their repayment.

The note specified that the principal, together with interest at the rate of 20 percent per annum, would be due to Mitchell six months after the date of the note. When payment became due in October 1980, White received the accrued interest from petitioner and delivered it to Mitchell, and at petitioner's request asked Mitchell whether she would prefer to receive her principal payment or reinvest it with petitioner. She indicated that she wished to reinvest the funds at the same rate of interest. She did not request, and neither White nor petitioner offered, any new security for the funds, nor did petitioner suggest that new security was required to secure the new arrangement.

In March 1982, Mitchell telephoned petitioner and requested her principal investment and accrued interest. Petitioner asked her to wait another six months for payment, and she agreed. At her request, he sent her a letter confirming that the interest on her loan would be paid at the rate of 20 percent per annum. In October 1982, Mitchell again demanded her funds. The real estate venture had resulted in large financial losses to petitioner, however, and he was unable to repay the money.

## II.

The hearing panel of the State Bar Court concluded that petitioner had abandoned his clients Rosenquist and Chang in violation of Business and Professions Code sections 6067, 6068 and 6103, and rule 6-101(A)(2). With regard to the Mitchell matter, it concluded that he had "entered into a business transaction with, or acquired an interest adverse to his client; and the transaction and terms were not fair and reasonable to his client" and had failed to comply with the safeguards prescribed by rule 5-101 for attorney-client transactions, "thereby committing acts involving moral turpitude, and dishonesty," in violation of Business and Professions Code sections 6067, 6068, 6103 and 6106, and rule 5-101. The panel recommended that petitioner be placed on suspension for three years, that such suspension be stayed subject to fulfillment of various conditions during a three-year probationary period, including ninety days' actual suspension and restitution to Chang and Mitchell. The review department unanimously adopted the hearing panel's findings and recommendation.

## III.

Petitioner concedes that he violated his duties as an attorney in the Rosenquist and Chang matters. ██ He denies that he violated any

duties as an attorney in the Mitchell matter, contending that the attorney-client relationship between himself and Mitchell had terminated before he entered into the loan transaction with her. He also asserts that even if the attorney-client relationship was still in existence at the time of the loan transaction, his violation of rule 5-101 was a technical one not involving moral turpitude.

■ It is our task independently to examine and reweigh the evidence in passing on the State Bar's disciplinary recommendation. (*Arden* v. *State Bar* (1987) 43 Cal.3d 713, 724 [239 Cal.Rptr. 68, 739 P.2d 1236].) It is petitioner's burden, however, to demonstrate that the State Bar's findings are unsupported by the evidence, or that its recommendations are erroneous or unlawful, and in assessing credibility great weight is given to the findings of the hearing body that saw and heard the witnesses and the petitioner. (*Id.* at p. 725.)

### A. *Attorney-client Relationship*

■ Rule 5-101 sets out certain requirements of fairness and full disclosure which an attorney must observe when entering into a business transaction with a client. (See, *ante*, p. 366, fn. 1.) Petitioner argues that he did not violate rule 5-101 because he was not Mitchell's attorney at the time he entered into the transaction with her. He advances two theories to support this claim. First, he contends the evidence is insufficient to support the hearing panel's finding that he solicited a loan from Mitchell at the time he arranged for the delivery of her settlement funds. Second, he argues that, even assuming he did so solicit her, he did not violate rule 5-101 because mere solicitation does not constitute "enter[ing] into" a transaction within the meaning of the rule, and the loan was not actually made until several months after the settlement funds were delivered and the attorney-client relationship terminated.

The evidence concerning the date of the initial solicitation of Mitchell is in conflict. Petitioner denied asking White to solicit Mitchell at the same time he asked him to deliver her settlement check. Mitchell's testimony on the point was ambiguous; she testified that, "After the settlement in 1979, that was all cleared, . . . White came talking to me about this realty investment . . . ." White testified that petitioner asked him to solicit the loan at the same time that he delivered the check. He also testified, however, that Mitchell decided to invest and gave him the money within a day or two of his delivering the settlement check and soliciting the loan.

White's account of the sequence of events contradicts Mitchell's testimony that she received the settlement funds on October 16, 1979, and made

the loan on March 25, 1980. Petitioner failed to inquire into this discrepancy on cross-examination, and it remains unexplained. The hearing panel resolved the conflict by crediting White's testimony concerning the date of the initial solicitation. As noted, we give great weight to the hearing panel's findings. (*Arden* v. *State Bar, supra,* 43 Cal.3d at p. 725.) White admitted to some uncertainty as to how much time elapsed between the solicitation and the investment, and the hearing panel may have justifiably discounted that portion of his testimony while crediting his account of the check delivery and solicitation. Accordingly, we will not disturb the panel's finding concerning the date of the initial solicitation.

Petitioner also argues that, even if we accept the hearing panel's findings regarding the solicitation of the loan, we should focus on whether an attorney-client relationship existed as of March 1980, when the loan was actually made, rather than October 1979, when the personal injury action was completed and the solicitation begun. He maintains that rule 5-101's proscription on "enter[ing] into" certain transactions with clients does not apply to preliminary solicitation or negotiation, but only to the actual consummation of the transaction, which in this case occurred several months after the personal injury representation had ended.

■ We decline to take such a narrow view of the reach of rule 5-101. One of the purposes of the rule is to protect clients from their attorneys' personal use of financial information gained from confidences disclosed during the attorney-client relationship. (*Arden* v. *State Bar, supra,* 43 Cal.3d 713, 726.) When a transaction results from an ongoing process of solicitation, begun during the attorney-client relationship and proceeding to consummation uninterrupted by advice from independent counsel, the transaction is properly viewed as one "entered into" during the attorney-client relationship under rule 5-101.

■ Moreover, even if we were to accept either of petitioner's contentions, that (i) the loan was not solicited until after the settlement funds were disbursed, or (ii) that rule 5-101 does not apply to the mere solicitation of a loan which is not made until after the attorney-client relationship has ended, we nonetheless would not hesitate to find an attorney-client relationship in this case. A client who receives the proceeds of a judgment or settlement will often place great trust in the investment advice of the attorney who represented him in the matter. This is especially likely when the client is unsophisticated and a large amount of money is involved. This trust arises directly from the attorney-client relationship, and abuse of this trust is precisely the type of overreaching that rule 5-101 is designed to prevent. ■ Accordingly, when an attorney enters into a transaction with a former client regarding a fund which resulted from the attorney's

representation, it is reasonable to examine the relationship between the parties for indications of special trust resulting therefrom. We conclude that if there is evidence that the client placed his trust in the attorney because of the representation, an attorney-client relationship exists for the purposes of rule 5-101 even if the representation has otherwise ended.

■ There is adequate evidence in this case to support a finding that Mitchell placed special trust in petitioner because he had represented her in obtaining the personal injury settlement. Petitioner emphasizes the fact that, under cross-examination, Mitchell stated she did not consider him to be her attorney at the time she made the loan. It is also true that Mitchell never met with petitioner personally until well after the loan had been made; all of their dealings were conducted over the telephone or through White. Mitchell also testified, however, "I trusted in [petitioner] because he had settled my Triple A claim." She also testified, "[t]his much money . . . I've never had before in my life." It appears that Mitchell became a target of petitioner's solicitation because he knew, through his representation of her, that she had recently received the settlement fund. Similarly, her lack of sophistication in financial matters would have been evident to petitioner because of his role as her attorney. Under these circumstances, we conclude the attorney-client relationship continued for the purposes of rule 5-101 at the time Mitchell made the loan.

This conclusion is supported by our decisions in *Wallis* v. *State Bar* (1942) 21 Cal.2d 322 [131 P.2d 531], and *Beery* v. *State Bar* (1987) 43 Cal.3d 802 [239 Cal.Rptr. 121, 739 P.2d 1289]. In *Wallis,* the bar brought a disciplinary action against an attorney who had defaulted on a loan obtained from a former client. Although we held that disciplinary action was not justified in that case, we based our decision on the fact that the former client was a sophisticated businesswoman who had actively negotiated for terms she thought desirable, and that the loan transaction was not connected with the land litigation the attorney had handled for her. We did not rely on the theory that the attorney-client relationship between the parties had terminated. ■ Our analysis in *Wallis, supra,* 21 Cal.2d 322, suggests that when an attorney enters into a transaction with a former client, the transaction must be scrutinized for signs of unfairness despite the fact that the attorney-client relationship has terminated for most purposes.

In *Beery, supra,* 43 Cal.3d 802, an attorney was charged with a violation of rule 5-101 for obtaining an investment in a precarious venture from Richard Coss, whom he had represented in a personal injury action. The attorney denied that he had been Richard Coss's attorney at the time of the transaction, particularly challenging Richard Coss's testimony that he had been consulting the attorney about a will when the attorney first solicited

him. We held that, "[e]ven apart from the will consultation, it would appear that the attorney-client relationship which existed during prosecution of the personal injury suit had not effectively terminated in relation to this business transaction. Given that petitioner had acted as attorney for Coss's business even before the personal injury litigation, *that the same fund of money was involved in both the personal injury litigation and the business transaction,* that Coss began soliciting petitioner's investment advice even before the final distribution of the litigation proceeds, and that nothing ever occurred which would signal to Coss an end of the attorney-client relationship, petitioner owed Coss the duties which attend the relationship of attorney and client." (*Beery* v. *State Bar, supra,* 43 Cal.3d at p. 812, italics added.) *Beery* makes clear that past representation with respect to a particular fund of money involved in a transaction is an important factor in determining whether an attorney-client relationship can still be found to exist.

Moreover, the application of rule 5-101 to a transaction between an attorney and a former client involving the fruits of the attorney's representation, if there is evidence that the client placed his trust in the attorney because of that representation, is consistent with the purpose of the rule and does not dramatically extend the definition of an "attorney-client relationship" beyond its common understanding. As the Supreme Court of Minnesota has explained, "Since the duty of fidelity and good faith arising out of the confidential relation of attorney and client is founded, not on the professional relation per se, but on the influence which the relation creates, such duty does not always cease immediately upon the termination of the relation but continues as long as the influence therefrom exists." (*Colstad* v. *Levine* (1954) 243 Minn. 279 [67 N.W.2d 648, 654-655].)

### B. *Moral Turpitude*

 Petitioner also contends that, even if he violated rule 5-101, the violation was merely a technical failure to abide by the rule's requirements and not an act of moral turpitude. The hearing panel specifically found, however, that petitioner entered into a transaction with a client that was not "fair and reasonable" to her. "The relationship between an attorney and client is a fiduciary relationship of the very highest character. All dealings between an attorney and his client that are beneficial to the attorney will be closely scrutinized with the utmost strictness for any unfairness." (*Clancy* v. *State Bar* (1969) 71 Cal.2d 140, 146 [77 Cal.Rptr. 657, 454 P.2d 329].) An attorney's violation of this fiduciary duty is an act of moral turpitude warranting severe discipline. (*Giovanazzi* v. *State Bar* (1980) 28 Cal.3d 465, 472-473 [169 Cal.Rptr. 581, 619 P.2d 1005].)

When an attorney-client transaction is involved, the attorney bears the burden of showing that the dealings between the parties were fair and

reasonable and were fully known and understood by the client. (*Clancy* v. *State Bar, supra,* 71 Cal.2d 140, 146-147.) ■ The record here does not clearly reveal the understanding of the parties with respect to the transaction. The original investment was secured by a note and deed of trust signed by White, but the value of this security was not established at the hearing. Accordingly, petitioner has not carried his burden of demonstrating the fairness of the transaction.

In addition, petitioner admits that following the expiration of the original six-month term the investment was converted to an unsecured loan. We have previously pointed to the absence of security, when security would ordinarily be considered essential to the client, as an indication of unfairness. (*Beery* v. *State Bar, supra,* 43 Cal.3d 802, 814-815.) Here, as noted above, Mitchell testified she had never before possessed as much money as she invested in this transaction. Under such circumstances, it appears highly unfair and unreasonable for petitioner to borrow her funds on an unsecured basis. Mitchell's testimony strongly indicates that she did not understand the nature of the transaction with petitioner and White. Thus, not only has petitioner failed to show that the transaction was fair and reasonable, but the record strongly indicates it was not.

### IV.

■ Although the ultimate decision on discipline rests with this court, the review department's recommendation is entitled to great weight. (*Beery* v. *State Bar, supra,* 43 Cal.3d. at p. 815.) "In deciding what discipline is warranted, each case must be decided on its own facts. (*Alberton* v. *State Bar* (1984) 37 Cal.3d 1, 14 [206 Cal.Rptr. 373, 686 P.2d 1177].)

In *Ritter* v. *State Bar* (1985) 40 Cal.3d 595, 604, footnote 9 [221 Cal.Rptr. 134, 709 P.2d 1303], we noted that violations of rule 5-101 have resulted in a wide range of discipline, ranging from private reproval in *Ames* v. *State Bar* (1973) 8 Cal.3d 910 [106 Cal.Rptr. 489, 506 P.2d 625], to two years' actual suspension imposed in *Krieger* v. *State Bar* (1954) 43 Cal.2d 604 [275 P.2d 459]. More recently, in *Beery* v. *State Bar, supra,* 43 Cal.3d 802, we imposed two years' actual suspension for a rule 5-101 violation. ■ In addition, the abandonment of two clients is a serious violation meriting discipline; "It is serious misconduct to willfully fail to perform the services for which the attorney is retained . . . as it is to willfully fail to communicate with the client . . . ." (*Mepham* v. *State Bar* (1986) 42 Cal.3d 943, 949 [232 Cal.Rptr. 152, 728 P.2d 222].)

■ Petitioner introduced certain mitigating evidence at the hearing, such as his marital problems which have since been resolved, his efforts to

mitigate his clients' damages, and his efforts to modify his practice to avoid future problems. The fact that petitioner has no prior disciplinary record is also properly considered in determining the appropriate penalty. (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 514 [153 Cal.Rptr. 24, 591 P.2d 47].) The hearing panel's findings indicate that it took these mitigating factors into account in formulating the proper discipline in this case. Viewing the record as a whole, the recommended discipline is appropriate.

Accordingly, it is ordered that petitioner be suspended from the practice of law for three years, that execution of the suspension be stayed, and that petitioner be placed on probation for said three years on the following conditions: (i) actual suspension from the practice of law for the first ninety days of said probation; (ii) payment of restitution to Chang in the sum of $1,000; (iii) payment of restitution to Mitchell in the sum of $5,000 with interest as promised; (iv) compliance with all other conditions set out in the hearing panel decision in this matter filed on September 5, 1986, and adopted by the review department on January 29, 1987. Petitioner is ordered to take and pass the Professional Responsibility Examination within one year after the effective date of this order. Petitioner is further ordered to comply with rule 955 of the California Rules of Court and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective upon the finality of this opinion.

KAUFMAN, J.—I concur in the decision and opinion of the court in all respects except one: In my view the 90-day period of actual suspension is inadequate. I would increase the period of actual suspension to a minimum of six months and preferably nine months.