523 S.E.2d 257

**The LAWYER DISCIPLINARY BOARD**

v.

**Geary M. BATTISTELLI,
Respondent Below.**

No. 23938.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 1, 1999.

Decided Oct. 13, 1999.

**200**

Amie L. Johnson, Disciplinary Counsel, Office of Disciplinary Counsel, Charleston, West Virginia, Attorney for The Lawyer Disciplinary Board.

Michael C. Allen, Charleston, West Virginia, Attorney for Geary Battistelli.

PER CURIAM:

The Lawyer Disciplinary Board (hereinafter "Board") recommends that this Court take disciplinary action against attorney Geary M. Battistelli (hereinafter "Respondent") based upon his conduct in three separate matters. After thorough review of the record and arguments of counsel, we agree with the determinations of the Board and order as follows: The Respondent's law license is hereby annulled; he will be permitted to apply for reinstatement on January 19, 2004; he will pay all costs of the disciplinary proceedings incurred incident to Counts I, II, and III in this matter; and he will reimburse the sum of $2,186 to his clients in the Count I controversy.

The Respondent's conditions of reinstatement, should such reinstatement be sought, shall include compliance with all provisions imposed by this Court in prior disciplinary proceedings against the Respondent; compliance with all provisions of the discipline imposed in this matter; supervised practice for a period of 2 years following his reinstatement upon terms imposed by the Office of Disciplinary Counsel and approved by this Court; and maintenance of a policy of professional malpractice liability insurance with limits of liability as agreed by the Office of Disciplinary Counsel and approved by this Court.

### I. Standard of Review: Disciplinary Actions

In syllabus point one of *Committee on Legal Ethics v. Pence*, 216 S.E.2d 236 (W.Va.1975), we explained that "[i]n a court proceeding initiated by the Committee on Legal Ethics of the West Virginia State Bar to annul the license of an attorney to practice law, the burden is on the Committee to prove, by full, preponderating and clear evidence, the charges contained in the Committee's complaint." A de novo standard of review has been utilized by this Court, as follows:

" 'A de novo standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.' Syl. pt. 3, *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994)." Syllabus Point 2, *Lawyer Disciplinary Bd. v. McGraw*, 194 W.Va. 788, 461 S.E.2d 850 (1995).

Syl. Pt. 3, *Lawyer Disciplinary Bd. v. Cunningham*, 195 W.Va. 27, 464 S.E.2d 181 (1995). We have also expressed our role as follows: "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 783 (1985).

In syllabus point four of *Office of Lawyer Disciplinary Counsel v. Jordan,* 204 W.Va. 495, 513 S.E.2d 722 (1998), we explained as follows:

Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerated factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court or Board shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."

We elaborated upon the Rule 3.16 requirement as follows in syllabus point five of *Jordan:*

Although Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates the factors to be considered in imposing sanctions after a finding of lawyer misconduct, a decision on discipline is in all cases ultimately one for the West Virginia Supreme Court of Appeals. This Court, like most courts, proceeds from the general rule, that absent compelling extenuating circumstances, misappropriation or conversion by a lawyer of funds entrusted to his/her care warrants disbarment.

In devising suitable sanctions for attorney misconduct, we have recognized that "[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys · and to safeguard its interest in the administration of justice." *Lawyer Disciplinary Bd. v. Taylor,* 192 W.Va. 139, 144, 451 S.E.2d 440, 445 (1994). We also asserted in syllabus point two of *In re Daniel,* 153 W.Va. 839, 173 S.E.2d 153 (1970), that "[d]isbarment of an attorney to practice law is not used solely to punish the attorney but is for the protection of the public and the profession." Syllabus point five of *Committee on Legal Ethics v. Roark,* 181 W.Va. 260, 382 S.E.2d 313 (1989), instructs:

"In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syllabus Point 3, *Committee on Legal Ethics v. Walker,* 178 W.Va. 150, 358 S.E.2d 234 (1987).

## II. Count I—Dr. Howard Tucker—Expert in Medical Malpractice Action

Dr. Howard Tucker, a physician practicing in Cleveland, Ohio, was retained as an expert witness in a medical malpractice action in the Circuit Court of Ohio County, West Virginia. In the underlying civil action, the Respondent served as counsel, from 1989 through 1992, to the personal representatives of the estate of Mrs. Edna Maruca, in a medical malpractice action against Wheeling Hospital, Inc., and two individual physicians, civil action number 90–C–396. The attorney who had initiated the plaintiffs' action had retained Dr. Tucker prior to the Respondent's representation of the plaintiffs. When the Respondent overtook representation of the plaintiffs, Dr. Tucker informed the Respondent that he was still owed $1,150 for his services. Dr. Tucker later testified at trial, charging an additional $4,800 for his trial testimony.[1]

The jury in the underlying civil action awarded $232,000 against Wheeling Hospital in 1993. In lieu of appeal, the parties settled the action for a $220,000 settlement, and Wheeling Hospital paid that settlement amount in April 1994.

Having failed to receive compensation for his services, Dr. Tucker instituted a civil action against the Respondent, dated Novem-

---

1. The Respondent apparently wrote Dr. Tucker a check dated April 12, 1993, for $2,000. That check was returned for insufficient funds, and the Respondent allegedly paid that $2,000 to Dr. Tucker at a later date.

ber 15, 1993, in the Court of Common Pleas in Cuyahoga County, Ohio, seeking recovery of $3,960 plus interest. On December 12, 1994, the Respondent confessed judgment in the Ohio collection action in the amount of $2,960, immediately paying $1,000 of the $3,960 owed. Dr. Tucker filed his complaint with the Office of Disciplinary Counsel in West Virginia on April 10, 1996, alleging that the Respondent had not paid the remaining $2,960 determined to be due to Dr. Tucker. The Respondent tendered a check to Dr. Tucker in the amount of $2,960 at the hearing before the Hearing Panel Subcommittee on February 27, 1998.

From the settlement amount of $220,000, the Respondent withheld $9,096 from the clients' settlement funds. Payments made from 1992 to 1998 to Dr. Tucker total $6,910, leaving the balance of $2,186 apparently over-withheld from client funds. That amount has not been accounted for or explained by the Respondent.

Subsequent to its review of this count, the Board concluded that the Respondent's failure to pay Dr. Tucker in a timely fashion constituted a violation of Rule 1.15(b) of the Rules of Professional Conduct. Rule 1.15(b) provides as follows:

> (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

The Board further concluded that by withholding client money from the settlement, in the amount determined to be $2,186, the Respondent violated Rule 8.4(c) of the Rules, providing as follows: "It is professional misconduct for a lawyer to ... [e]ngage in con-duct involving dishonesty, fraud, deceit or misrepresentation."

■ We agree with the conclusions and recommendations of the Board regarding appropriate discipline in Count I, the Dr. Tucker claim. While the Respondent contends that Dr. Tucker failed to file the ethics complaint within the prescribed statute of limitations,[2] we find that Dr. Tucker satisfied the statute of limitations by filing in April 1996. Based upon the change in counsel from the original attorney to the Respondent, there was apparently considerable controversy during the underlying proceedings regarding the precise compensation to which Dr. Tucker was entitled. Further, the Wheeling Hospital settlement payment was not tendered until April 1994, and no exact amount of money was determined to be owed until the Respondent confessed judgment in the Ohio court during the civil action instituted by Dr. Tucker against the Respondent. Consequently, the April 1996 filing of the ethics complaint was within the 2–year statute of limitations.

The Respondent did not pay Dr. Tucker the entirety of his fee until February 1998, during a Subcommittee hearing on the ethics complaint. We find that such overt and conspicuous failure to pay Dr. Tucker is violative of Rule 1.15(b) of the Rules of Professional Conduct, as quoted above.

In *Lawyer Disciplinary Board v. Kupec*, 202 W.Va. 556, 505 S.E.2d 619 (1998), we exhaustively evaluated the issue of misappropriation of client funds by an attorney and recognized as follows:

> The term misappropriation can have various meanings. In fact, the misuse of another's funds is generally characterized as misappropriation or conversion. Black's defines misappropriation as "[t]he unauthorized, improper, or unlawful use of funds or other property for purposes other than that for which intended ... including not only stealing but also unauthorized temporary use for [the] lawyer's own purpose, whether or not he derives any gain

---

**2.** Rule 2.14 of the Rules of Disciplinary Procedure provides as follows: "Any complaint filed more than two years after the complainant knew, or in the exercise of reasonable diligence should

have known, of the existence of a violation of the Rules of Professional Conduct, shall be dismissed by the Investigative Panel."

or benefit therefrom." Black's Law Dictionary (6th ed.1990). See *In re Wilson*, 81 N.J. 451, 409 A.2d 1153, 1155 n. 1 (1979) (defining misappropriation as "any unauthorized use by the lawyer of client's funds entrusted to him including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom").

202 W.Va. at 568, 505 S.E.2d at 631.

■■■■ We further explained that "[r]estitution is not a defense to misappropriation." In syllabus point four of *Committee on Legal Ethics of West Virginia State Bar v. Hess*, 186 W.Va. 514, 413 S.E.2d 169 (1991), we explained: "The repayment of funds wrongfully held by an attorney does not negate a violation of a disciplinary rule. Any rule regarding mitigation of the disciplinary punishment because of restitution must be governed by the facts of the particular case."[3] We acknowledged in *Hess* that "[i]f a lawyer converts [others'] monies to his or her own use without authorization, the attorney is subject to a disciplinary charge. Such conduct obviously reflects a dishonest and deceitful nature which violates the general precept that an attorney should avoid dishonesty or deceitful conduct." 186 W.Va. at 517, 413 S.E.2d at 172.

According to the findings of the Board, as explained above, an additional $2,186 in client funds has still not been paid to the clients by the Respondent. We order the Respondent to reimburse his client, the estate of Mrs. Maruca, the sum of $2,186.

### III. Count II—Fletcher O'Dell— Black Lung Benefits Matter

Subsequent to legal representation of Mr. Fletcher O'Dell in a successful federal black lung claim in March 1993, the Respondent requested a loan of $10,000 from Mr. O'Dell. Mr. O'Dell agreed to loan the money, and the Respondent executed an "assignment"[4] consummating that loan on March 4, 1993. Mr. O'Dell's signature does not appear on that assignment. The Respondent further represented to Mr. O'Dell that he was applying to the United States Department of Labor for an award of attorney fees based upon his successful representation of Mr. O'Dell in the black lung claim and would repay the loan from his fee award.

Mr. O'Dell did not have the benefit of legal advice with regard to the transaction, and his daughter testified that he still considered the Respondent his attorney and felt obligated to give the Respondent the requested loan since the Respondent had assisted him in obtaining a favorable result in the black lung claim. The Respondent did not repay the $10,000 plus accrued interest by May 20, 1993, as agreed. In August 1993, Mr. O'Dell hired another attorney to attempt collection from the Respondent.

Mr. O'Dell filed the complaint alleging an ethical violation on May 18, 1995. As of that date, the Respondent had repaid $3,850 to Mr. O'Dell. The Hearing Panel Subcommittee heard Mr. O'Dell's testimony by video deposition in February 1998. During that video deposition, the Respondent presented Mr. O'Dell with a check representing the remaining balance of the loan.

The Subcommittee found that although the Respondent maintained that the attorney-client relationship terminated immediately prior to his request for a loan, the Respondent still planned to act in the capacity of Mr. O'Dell's attorney in his application for attorney fees. The Subcommittee further found that a determination of whether an attorney-client relationship continues to exist should be viewed from the perspective of the client, rather than the attorney, and that the attorney-client relationship was still in existence at the time the loan was consummated.

The Subcommittee concluded that the Respondent had violated the following rules:

---

**3.** Restitution may be considered as a mitigating factor in the imposition of sanctions. *See Lawyer Disciplinary Bd. v. Kupec*, 202 W.Va. 556, 569–70, 505 S.E.2d 619, 632–33 (1998).

**4.** The assignment indicated that the loan was to be repaid on or before May 20, 1993, at 8% interest, and stated that the Respondent was no longer Mr. O'Dell's attorney. The assignment further provided that the Respondent's interest in property being timbered would be assigned as collateral to secure the loan.

Rule 1.8(a) of the Rules of Professional Conduct[5] by obtaining a loan with no security interest protecting the client; and Rule 8.4(c), as quoted above, by failing to explain the facts surrounding the security interest, by including inaccurate and incomplete language in the assignment, and by failing to pay back the loan in a timely manner.

 The Respondent claims that Rule 2.14 of the Rules of Lawyer Disciplinary Procedure, as quoted above, prohibits this action against him since more than 2 years passed between the time of the alleged misconduct and the filing of the complaint. The Subcommittee found that there was no evidence that Mr. O'Dell knew or in the exercise of reasonable diligence should have known that the Respondent's conduct violated the Rules until he consulted another attorney based upon the Respondent's failure to repay the loan.

We agree with the recommendations of the Board regarding the appropriate discipline to be imposed in the O'Dell claim. The statute of limitations was satisfied since Mr. O'Dell neither knew nor reasonably should have known of the ethical violation until he consulted a different attorney in August 1993; the complaint was then filed in May 1995.

 Further, we agree with the Board that the attorney-client relationship was still in existence at the time of loan was requested. Courts have struggled with the concept of the parameters of the attorney-client relationship, its initiation, and its conclusion. "What constitutes an attorney-client relationship is a rather elusive concept." *Folly Farms I, Inc. v. Trustees*, 282 Md. 659, 387 A.2d 248, 254 (1978). A rudimentary answer to that query would perhaps propose that the relationship terminates "where the purpose of an attorney's employment has been accomplished...." *Schwarze v. May Department Stores*, 360 S.W.2d 336, 338 (Mo.App.1962).

Acceptance of that simple standard, however, would detrimentally overlook a fundamental maxim of the attorney-client relationship. Having obtained loans from clients, an attorney in *In re Imming*, 131 Ill.2d 239, 137 Ill.Dec. 62, 545 N.E.2d 715 (1989), contended that "there was a definite point in time where [he] ceased rendering legal services to the clients before the loans were made." *Id.* at 721. The court recognized, however, that some of the clients had "directly invested the proceeds of the legal work respondent performed for them...." *Id.* "All of the loans in these five situations, therefore, occurred so close in time to the respondent's legal services to each client as to cause the client to believe that the respondent's business relations were a continuation of the attorney-client relationship." *Id.*

In *Hunniecutt v. State Bar of California*, 44 Cal.3d 362, 243 Cal.Rptr. 699, 748 P.2d 1161 (1988), the court explained as follows:

A client who receives the proceeds of a judgment or settlement will often place great trust in the investment advice of the attorney who represented him in the matter. This is especially likely when the client is unsophisticated and a large amount of money is involved. This trust arises directly from the attorney-client relationship, and abuse of this trust is precisely the type of overreaching that rule 5–101 is designed to prevent. Accordingly, when an attorney enters into a transaction with a former client regarding a fund which resulted from the attorney's representation, it is reasonable to examine the relationship between the parties for indications of special trust resulting therefrom. We conclude that if there is evidence that the client placed his trust in the attorney because of the representation, an attorney-client relationship exists for the purposes of rule 5–101 even if the representation has otherwise ended.

---

**5.** Rule 1.8(a) provides as follows:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

*Id.* at 1166. The *Hunniecutt* court concluded that there is an attorney-client relationship as a matter of law where a client receives settlement proceeds and is then solicited by the attorney to invest in the attorney's business. *Id.* at 1165–66.

As the Supreme Court of Minnesota has explained, "[s]ince the duty of fidelity and good faith arising out of the confidential relation of attorney and client is founded, not on the professional relation per se, but on the influence which the relation creates, such duty does not always cease immediately upon the termination of the relation but continues as long as the influence therefrom exists." *Colstad v. Levine*, 243 Minn. 279, 67 N.W.2d 648, 654–55 (1954).

The personal perception of the client is also significant to the determination of whether the attorney-client relationship is in continued existence. "Because the existence of any attorney-client relationship turns largely on the client's subjective belief that it exists, this court has held that an unsophisticated client who is asked for a loan by her attorney out of her settlement proceeds is justified in believing the lawyer is acting as her attorney and guardian of her interests." *Louisiana State Bar Assoc. v. Williams*, 498 So.2d 727, 728 (La.1986), citing *Louisiana State Bar Assoc. v. Bosworth*, 481 So.2d 567 (La.1986). Likewise, in *Matter of McGlothlen*, 99 Wash.2d 515, 663 P.2d 1330 (1983), the court found that "[t]he existence of an attorney-client relationship turns largely on the client's subjective belief that it exists." *Id.* at 1334. *See* E. Cleary, *McCormick on Evidence* § 88 at 179 (2d ed.1972).

An illuminating hypothetical was postulated in *In re Drake*, 292 Or. 704, 642 P.2d 296 (1982). An attorney had been accused of borrowing $10,000 from his client, in violation of several attorney disciplinary rules, and had contended the attorney-client relationship had terminated prior to the procurement of the loan. In holding that the attorney-client relationship had not ceased, the court advanced the following, quoting from the Disciplinary Board in the underlying investigation:

If Accused's contention is to be accepted, then the simple termination of a case creates an opportunity or period in which an attorney is freed from the rules governing attorney-client relationships. During this period the attorney would be free to use the rapport and confidence he had developed with his former client to persuade the former client to do things that would otherwise be prohibited by disciplinary rules governing client relationships. After these actions were completed, the attorney could then freely enter into a new relationship with the former client. The only important thing would be that the paperwork showing opening and closing dates of cases be kept in order. The attorney would point to these as proof the aggrieved party was not a client during the period in question.

*Id.* at 301–302.

The elements of trust, rapport, and gratitude were present in the case sub judice and compel our conclusion that the attorney-client relationship had not terminated when the loan was procured. Based upon our review of this count, we agree with the disciplinary sanctions recommended by the Board.

## IV. Count III—Larry E. Smith— Labor/Employment Matter

Mr. Larry Smith hired the Respondent in connection with an employment dispute between Mr. Smith and his former employer, Sturm Machinery, in Cabell County, West Virginia.[6] The employer filed a motion to dismiss on October 4, 1985. The Respondent did not reply to this motion until June 19, 1992, more than 6½ years later. In 1987, Mr. Smith had requested inquiry complaint forms from the West Virginia State Bar, and such complaint forms were mailed to Mr. Smith on October 12, 1987. By letter dated July 14, 1989, Mr. Smith informed the Respondent that he had examined the court file in Cabell County and had discovered that no progress had been made in the case since January 1986. The letter requested an immediate

---

**6.** The underlying lawsuit alleged unlawful discriminatory practices under the Human Rights Act and Workers' Compensation Discrimination, the breach of a collective bargaining agreement, and the breach of an employment contract.

response and advice regarding what progress had been made on the Smiths' civil action.

As a result of a 6½ year delay by the Respondent in filing a response to the employer's motion to dismiss, the passage of time, and the difficulty in locating defense witnesses, the circuit court granted the employer's motion to dismiss on May 12, 1993. The Respondent filed a notice of intent to appeal the dismissal on June 3, 1993, and informed Mr. Smith that he planned to file a Petition for Appeal. He later assured Mr. Smith that an appeal had been filed. Despite Mr. Smith's repeated attempts to gather information regarding the progress of his appeal, the Respondent informed Mr. Smith that "these things take time" and that the Respondent would contact Mr. Smith when he heard something regarding the appeal. In April 1995, Mr. Smith personally telephoned this Court and learned that no appeal had been filed.

The Smiths filed a complaint with the Office of Disciplinary Counsel on June 19, 1995. In responding to the complaint, the Respondent indicated that he had failed to file the appeal because it would not have been successful; yet he had never communicated this concern to the client. He acknowledged that he "put his head in the sand when he realized that his client had no case."

The Subcommittee found the following violations: Rule 1.2(a) [7] through failure to file a petition for appeal when his clients had directed him to do so; Rule 1.3 [8] through failure to diligently pursue the appeal; Rule 1.4 [9] through failure to inform Mr. Smith of the status of his suit and by failing to communicate his view that the appeal would ultimately be unsuccessful; Rule 3.2 [10] through failure to expedite litigation through an appeal; and Rule 8.4(c), as quoted above, through failure to file an appeal and misrepresenting the status of the case to the client.[11]

■ While the Respondent again raises a statute of limitations issue regarding the extent to which Mr. Smith was aware of the ethical violations several years prior to the filing of the complaint, that issue is fittingly resolved by referencing the client's telephone call to this Court in April 1995, during which he learned that no appeal had been filed. That was the definitive point at which lingering suspicion regarding delayed progress became certain realization of deception and misrepresentation. The ethics complaint was thereafter filed in June 1995. The Respondent's actions in this count indicate neglect of client affairs, repeated lying to the client about the status of the case, and failure to act with reasonable diligence in representing a client.

## V. Conclusions

■ The Respondent's irresponsible behavior in the three issues considered above is violative of the duties owed by the Respondent to his clients, the public, and the legal community. We find that the Respondent acted knowingly and intentionally in these violations and that his behavior caused harm to those with whom he dealt in the three different scenarios. "The Hallmark of the

7. Rule 1.2(a) provides as follows:
 (a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

8. Rule 1.3 provides the "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

9. Rule 1.4 provides as follows:
 (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
 (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

10. Rule 3.2 provides that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client."

11. Two additional counts, one involving clients who were ultimately unavailable to testify and another asserting a pattern and practice of violating the Rules of Professional Conduct, were initially alleged. The Hearing Panel Subcommittee recommends dismissal of those matters, and we agree with that determination.

practicing lawyer is responsibility to clients regarding their affairs, whether as advisor, advocate, negotiator, as intermediary between clients, or as evaluator by examining a client's legal affairs." *In Re Application of R.G.S.*, 312 Md. 626, 541 A.2d 977, 980 (1988). The Respondent has not demonstrated his ability to adhere to this standard of deportment. His acts clearly illustrate his unwillingness to conduct his professional affairs in compliance with the Rules of Professional Conduct. Consequently, we cannot continue to entrust him with the privilege of managing client affairs and practicing law in the State of West Virginia.

In fashioning the appropriate disciplinary action in this case, this Court is cognizant of the Respondent's prior suspension from the practice of law based upon unrelated disciplinary proceedings.[12] That suspension commenced on May 18, 1995, was scheduled to continue for a period of 2 years and 9 months, and would have terminated on February 18, 1998. In annulling the Respondent's license in this matter, we find that the Respondent should be permitted to apply for reinstatement 5 years from the date upon which the Board recommended the annulment of his license on January 19, 1999. Thus, the date upon which the Respondent could seek reinstatement would be January 19, 2004.

It is so Ordered.

Judge RISOVICH, sitting by temporary assignment.

---

**12.** This Court has also been apprised of the extensive hardships occurring in the Respondent's personal life during some of the events in question in this opinion. He has suffered failed business enterprises, financial hardship, Internal Revenue Service inquiries, the death of a brother, a divorce, and the serious illness of his parents. While we sympathize with the Respondent's misfortunes, the substantial adverse impact upon his professional endeavors cannot be overlooked. Additionally, the violations discussed herein were not isolated occurrences. The Respondent had previously been disciplined by this Court after being sanctioned by the Fourth Circuit for misstating the record in an attempt to mislead the federal court. *See Com-*

*mittee of Legal Ethics v. Battistelli,* 185 W.Va. 109, 405 S.E.2d 242 (1991); *Holcomb v. Colony Bay Coal Co.,* 852 F.2d 792 (4th Cir.1988). Further, in *Office of Disciplinary Counsel v. Battistelli,* 193 W.Va. 629, 457 S.E.2d 652 (1995), this Court temporarily suspended the Respondent's license until disciplinary proceedings were completed based upon a potential threat to the public, based upon failure to refund a retainer, making false statements regarding a retainer, requesting a loan from a client, making a false statement to a bank officer about the desired loan, failing to refund money, failing to keep clients advised of the status of cases, and making false statements regarding the recording of a deed.