663 S.E.2d 614

**LAWYER DISCIPLINARY BOARD, Petitioner**

v.

**Michael P. MARKINS, a Member of the West Virginia State Bar, Respondent.**

No. 33256.

Supreme Court of Appeals of West Virginia.

Submitted April 1, 2008.

Decided May 23, 2008.

Concurring Opinion of Justice Starcher June 8, 2008.

Rachael L. Fletcher Cipoletti, Charles A. Jones, III, Office of Disciplinary Counsel, Charleston, WV, for the Petitioner.

Michael O. Callaghan, Neely & Callaghan, Charleston, WV, for the Respondent.

PER CURIAM:

In this lawyer disciplinary proceeding, Respondent Michael P. Markins ("Respondent") objects to the sanctions recommended by a Hearing Panel Subcommittee of the Lawyer Disciplinary Board ("Board") for violations of the West Virginia Rules of Professional Conduct ("Rules"). Following a disciplinary hearing conducted on July 20, 2007, the Board determined that Respondent violated Rules 8.4(b) and (c) by repeatedly accessing the e-mail accounts of other attorneys, without their knowledge or permission, for over a two-year period. The Board recommends, *inter alia*, that Respondent be suspended from the practice of law for a period of two (2) years. Though Respondent does not dispute the facts giving rise to the disciplinary charges filed against him, he contends the recommended sanctions are too harsh.

For the reasons discussed below, we adopt the Board's recommendations.

I. Factual and Procedural Background

The facts of this case are not in dispute. Respondent has been a practicing attorney since October, 2001. At all times relevant, Respondent was employed as an associate attorney at the law firm of Huddleston Bolen, LLP ("Huddleston").[1] His wife, also an

---

1. It is undisputed that while in law school Respondent was an outstanding student, graduating

162

attorney, was similarly employed at the law firm of Offutt, Fisher & Nord ("OFN"). In late October or early November of 2003, Respondent began accessing his wife's OFN e-mail account without her permission or knowledge.[2] Respondent testified that the purpose of reading his wife's e-mails was to secretly monitor her activities because he believed she had become involved in an extramarital affair with an OFN client. Respondent further testified that, initially, he improperly accessed only his wife's account and later, that of another attorney, an OFN partner.[3] Eventually, however, Respondent's curiosity got the better of him, and he began accessing the e-mail accounts of seven other OFN attorneys. Obviously, Respondent did so without either the knowledge or permission of the account holders.

When an OFN attorney began to suspect that her e-mail account had been improperly accessed, OFN retained Paul Law, a computer systems engineer, and launched an investigation. From Mr. Law's investigation, it was learned that on numerous occasions from sometime prior to November 7, 2003, until March 16, 2006, Respondent gained unauthorized access to OFN e-mail accounts from three IP accounts:[4] Respondent's Huddleston IP account; Respondent's residential IP account; and the IP account at the Hampton Inn in Beckley, West Virginia, where Respondent had been monitoring a trial in which both Huddleston and OFN clients were being represented.

According to D.C. Offutt, Jr., the managing partner of OFN, although they were not able to view the actual e-mail messages read by Respondent, they were able to determine which e-mail accounts were accessed, the date and time they were accessed, and from what IP account. Furthermore, Mr. Offutt testified that if there was an attachment to an e-mail, they could determine whether the attachment had been opened. More specifically, they were able to determine that on one occasion certain confidential OFN financial information sent by the firm's chief accountant to the firm's partners by e-mail attachment was opened by Respondent.

It is undisputed that Respondent improperly accessed the e-mail accounts of OFN attorneys on more than 150 occasions. In so doing, Respondent learned personal information about certain attorneys which had been relayed confidentially via e-mail. With regard to confidential client information that had been accessed by Respondent, Mr. Offutt was particularly concerned with the fact that OFN and Huddleston, Respondent's employer, represented co-defendants in a large mass tort case that was in litigation during the time period at issue. In March, 2006, Respondent, along with other lawyers whose firms were involved in the mass litigation, was monitoring the trial from the Hampton Inn in Beckley, West Virginia. While monitoring the proceedings, Respondent gained unauthorized access into various OFN e-mail accounts from the Hampton Inn's IP account. According to Mr. Offutt, Huddleston's mass tort client had a contractual relationship with and a claim for indemnity against OFN's client. Though the claim was not then being litigated, Mr. Offutt testified that information included in the firm's e-mail system would have been "helpful" to Huddleston's client. However, neither Huddleston nor OFN found evidence that any information between OFN attorneys and its client in that case had been compromised.[5]

near the top of his class. While at Huddleston, Respondent was well thought of in the legal community and was on the firm's "Partnership Track."

2. The password to his wife's e-mail account was her last name. Similarly, the passwords to the e-mail accounts of all OFN attorneys was the individual account holder's last name.

3. During his testimony before the Board, Respondent described an e-mail between his wife and an OFN partner in which the partner encouraged Respondent's wife to join her and a particular client in an evening out. (It is unclear from Respondent's testimony if this is the same client with whom he suspected his wife of having an affair.) According to Respondent, the partner's e-mail suggested that they would keep the evening a secret from Respondent.

4. Mr. Law explained that, "[i]n layman's terms, an IP address is basically a phone number for a computer.... It's basically Caller ID for computer systems."

5. When contacted by Mr. Offutt about the breach in OFN's e-mail system by one of its employees.

Following the disciplinary hearing in this case, Mr. Offutt indicated in an affidavit[6] that, since Respondent's misconduct was reported by the Charleston Gazette newspaper and the Associated Press, OFN "has suffered further damage to its image and reputation." Mr. Offutt further indicated that one of the firm's clients expressed "serious concerns" about the security breach and about whether Respondent improperly accessed important information concerning that client. According to Mr. Offutt, this client has put the firm on notice of a potential claim for damages against it. Mr. Offutt indicated that he anticipates that similar concerns will be expressed by other clients in the future and that the negative ramifications and stigma of Respondent's misconduct will be felt for many years. Finally, Mr. Offutt indicated that his firm suffered direct economic losses as a result of Respondent's actions: Mr. Offutt, along with other firm lawyers and staff, spent considerable time and resources investigating and attending internal meetings on the matter and were distracted by the events and their aftermath.

As indicated above, Respondent does not dispute the facts giving rise to this disciplinary proceeding. He testified that in the beginning he began accessing his wife's OFN e-mail account and that of another OFN attorney for the sole purpose of determining if his wife was having an extramarital affair with a client. He later began accessing the e-mail accounts of other OFN attorneys purely "out of curiosity" and "almost on a daily basis." As noted previously, Respondent accessed the e-mail accounts of a total of nine OFN attorneys (including his wife), without their knowledge or permission, at

least 150 times beginning in late October or early November, 2003.

In March 2006, Respondent's wife, who had been completely unaware of Respondent's misconduct, told Respondent that someone had been breaking into OFN e-mail accounts and that the firm was getting close to finding out who it was. Shortly thereafter, Respondent revealed to his wife that it was he who had been improperly accessing the OFN e-mail accounts. The following day, Mr. Offutt, who had learned from the computer expert's investigation that Respondent was responsible for the unauthorized access of the e-mail accounts, inquired of Respondent's wife if she was aware of Respondent's actions. Though she had just learned of Respondent's misconduct, she denied any knowledge of it to Mr. Offutt. Immediately thereafter, Respondent's counsel contacted Mr. Offutt and others at the firm to disclose his actions. Both Respondent and his wife were eventually terminated from employment by their respective law firms as a result.[7]

Respondent has consistently maintained that he has never disclosed to anyone any information he obtained from improperly accessing the various OFN e-mail accounts.[8] He testified that he has never used any of the information in an improper manner; did not save any of the accessed e-mails onto his computer; and did not forward any of the e-mails to another person. Indeed, to date, there has been no evidence to the contrary. Respondent testified that he is extremely remorseful for his actions, takes full responsibility for his misconduct, and has been cooperative during the course of this

---

Huddleston conducted its own investigation to determine if Respondent had ever saved OFN e-mails or other OFN computer files in Huddleston's computer system. From its investigation, Huddleston found no information improperly accessed from the OFN e-mails on its computer system.

**6.** An affidavit by Mr. Offutt was given on March 24, 2008, and was attached to the Reply Brief of the Lawyer Disciplinary Board filed with this Court on March 26, 2008.

**7.** Respondent's wife was initially placed on administrative leave, with pay. When Mr. Offutt

learned that Respondent's wife did not answer truthfully when she denied knowledge of Respondent's misconduct, her employment was terminated. As indicated above, Respondent's wife did not know about Respondent's misconduct until he disclosed it to her the evening before she met with Mr. Offutt.

**8.** According to Respondent, he did not discuss with anyone any of the improperly-accessed information, with one notable exception: He testified that when he disclosed his misconduct to his wife, he then confronted her about sexually-suggestive e-mails she received from the OFN client with whom Respondent suspected she was having an affair.

disciplinary proceeding and during OFN's investigation of the matter.[9]

On the advice of counsel, Respondent was examined by psychologist David A. Clayman, Ph.D., whose affidavit was submitted with Respondent's Answer to Statement of Charges before the Board. Dr. Clayman opined that the primary purpose of Respondent's actions was to determine if his wife was having an inappropriate relationship with an OFN client or employee. Dr. Clayman opined further that Respondent's

> review of any material not specifically related to his concerns regarding a perceived extramarital affair involving his wife constituted aberrant acts that are a significant departure from his usual behavior. These aberrant acts would be attributed to the significant emotional stress brought on by [Respondent's] concern for the stability of his marriage.

According to Dr. Clayman, Respondent would not have engaged in the misconduct herein described if it were not for the "significant emotional strain caused by concern for the integrity of his marriage[,]" and that he is unlikely to repeat this or any similar conduct in the future in light of the resulting professional and personal embarrassment he has suffered, the strain and hardship on his family, and the remorse he feels for what he did.

On December 18, 2006, the Board filed a Statement of Charges against Respondent, alleging violations of Rule 8.4(b) and (c) of the West Virginia Rules of Professional Conduct. The Board alleged violations of Rule 8.4(c) "[b]ecause Respondent engaged in the repetitive unauthorized access of [OFN] e-mail accounts by improperly using various e-mail account passwords assigned to various [OFN] attorneys." Under Rule 8.4(c). "[i]t is professional misconduct for a lawyer to: ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

The Board also alleged violations of Rule 8.4(b) "[b]ecause Respondent's repetitive unauthorized access of [OFN] e-mail accounts was criminal in nature, violated West Virginia Code 61–3C–12,[10] and adversely reflected on his honesty, trustworthiness or fitness as a lawyer[.]" (Footnote added). Under Rule 8.4(b), "[i]t is professional misconduct for a lawyer to: ... (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]" The Board further alleged there to be "aggravating factors," stating that "Respondent's conduct involved multiple offenses and a pattern of misconduct, was for a selfish motive, and constituted illegal acts."

Following the disciplinary hearing before the Board, the Board found Respondent had violated Rules 8.4(b) and (c), as charged, and recommended the following sanctions:

1. That Respondent be suspended from the practice of law for a period of two (2) years;

2. That, upon reinstatement, Respondent's private practice be supervised for a period of one (1) year;

---

9. In his affidavit, Mr. Offutt stated that in order to further determine if Respondent did not view confidential client information, he requested access to Respondent's personal home computer. Mr. Offutt indicated that his request was denied. In contrast, Respondent argues that when asked for access to his computer by Mr. Offutt, Mr. Offutt was told that his request would be considered after Respondent's computer at Huddleston was examined. Respondent contends that once it was determined by independent computer experts examining Respondent's work computer that Respondent did not compromise or disseminate any information from OFN's computer system, Mr. Offutt did not repeat his request to have Respondent's home computer examined.

10. W.Va.Code § 61–3C–12 (1989) (Repl.Vol. 2005) states:

> Any person who knowingly, willfully and without authorization accesses a computer or computer network and examines any employment, salary, credit or any other financial or personal information relating to any other person, after the time at which the offender knows or reasonably should know that he is without authorization to view the information displayed, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not more than five hundred dollars or confined in the county jail for not more than six months, or both.
> No criminal charges arising out of Respondent's unauthorized access of OFN e-mail accounts have ever been filed against Respondent.

3. That Respondent complete twelve (12) hours of CLE in ethics in addition to such ethics hours he is otherwise required to complete to maintain his active license to practice, said additional twelve (12) hours to be completed before he is reinstated; and

4. That Respondent pay the costs of these proceedings.

Respondent objects only to the recommended sanctions. Initially, Respondent proposed that he be publicly reprimanded and be required to complete an additional six hours of CLE in ethics above his current requirements. During oral argument, however, he conceded that while a public reprimand may not be an appropriate sanction, in light of the mitigating factors present in this case, the proper sanction is something less than a two-year suspension of his law license.

## II. Standard of Review

 Our standard of review of lawyer disciplinary proceedings was set forth in syllabus point 3 of *Committee on Legal Ethics v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994), as follows:

A de novo standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

Furthermore, we have made clear that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syl. Pt. 3, *Committee on Legal Ethics v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984).

## III. Discussion

 As previously noted, the facts giving rise to this disciplinary proceeding and the resulting ethical violations found by the Board are not in dispute. Therefore, our singular purpose in this matter is to determine the appropriate sanction, recognizing that

" ' "[i]n deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syllabus point 3, *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987).' Syl. Pt. 5, *Committee on Legal Ethics v. Roark*, 181 W.Va. 260, 382 S.E.2d 313 (1989)." Syllabus point 7, *Office of Lawyer Disciplinary Counsel v. Jordan*, 204 W.Va. 495, 513 S.E.2d 722 (1998).

Syl. Pt. 4, *Lawyer Disciplinary Bd. v. Wade*, 217 W.Va. 58, 614 S.E.2d 705 (2005). Indeed, " '[a]ttorney disciplinary proceedings are not designed solely to punish the attorney, but rather to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice.' *Lawyer Disciplinary Bd. v. Taylor*, 192 W.Va. 139, 144, 451 S.E.2d 440, 445 (1994)." *Lawyer Disciplinary Bd. v. Battistelli*, 206 W.Va. 197, 201, 523 S.E.2d 257, 261 (1999).

Furthermore, as we held in syllabus point 2 of *Lawyer Disciplinary Bd. v. Lakin*, 217 W.Va. 134, 617 S.E.2d 484 (2005),

"Rule 3.16. of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: 'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system or to the profes-

sion; (2) whether the lawyer acted intentionally, knowingly or negligently: (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors." Syl. pt. 4, *Office of Lawyer Disciplinary Counsel v. Jordan,* 204 W.Va. 495, 513 S.E.2d 722 (1998).

■ Respondent contends there were mitigating factors that this Court should consider in determining the sanction to be imposed.[11] According to Respondent, he believed his wife was engaged in an extramarital affair with an OFN client and that the relationship was encouraged by OFN partners. Thus, he secretly accessed his wife's OFN e-mail account and the accounts of other OFN attorneys while under extreme emotional distress, fearing he would lose his wife and family. As Dr. Clayman indicated, were it not for the grave emotional strain caused by his suspicions about his wife's activities, Respondent would not have engaged in the misconduct described.

Additional mitigating factors offered by Respondent were the fact that he acted without criminal intent and, indeed, has not been charged with any crime in connection with his misconduct; his actions did not cause harm (or intend to cause harm) to his clients, his firm's clients, or the clients of OFN; he has never divulged any information he obtained to anyone with the one exception of confronting his wife about the inappropriate e-mails she received from an OFN client; he is extremely remorseful for his actions; he has never before been accused of ethical impropriety, but rather, was highly regarded by his peers and clients; he has cooperated fully with the Board during its investigation and in these proceedings; he has suffered extreme personal and professional embarrassment; he was a relatively inexperienced lawyer when the misconduct occurred; and

he has already suffered significant financial losses, having been placed on administrative leave, without pay, for two months.

Further, Respondent argues that this matter is similar to the case of *Lawyer Disciplinary Bd. v. Losch,* 219 W.Va. 316, 633 S.E.2d 261 (2006), in which this Court imposed a public reprimand on an attorney who unilaterally altered a court document, in violation of Rule 8.4(c) and (d). The respondent attorney in *Losch* obtained a default judgment for a sum certain on behalf of his client against "Jamie Woods, individually, and Jamie Woods d/b/a Woods Construction Company, Defendants." *Id.* at 317, 633 S.E.2d at 262. Thereafter, the respondent attorney obtained a suggestion (suggestee execution) from the circuit clerk's office directed to Midstate Pre–Owned Autos, the local business where Woods was working. When the respondent attorney came to believe that Jamie Woods was operating as AJM Corporation, he unilaterally altered the language on the suggestion to read Jamie Woods, individually, and Woods Construction Company and "dba AJM Corporation."

Upon being charged with ethical violations, the respondent attorney in *Losch* admitted that "he did not file a motion or take any other action to amend the judgment order against Jamie Woods to include 'AJM Corporation[,]' [n]or did he obtain any court order authorizing the issuance of a suggestion upon 'AJM Corporation.'" *Id.* at 318, 633 S.E.2d at 263. However, the respondent attorney argued that the alteration had no legal force or effect and that his action, "although intentional, did not create any actual or potential injury." *Id.* at 319, 633 S.E.2d at 264. Moreover, respondent attorney contended AJM Corporation had its charter revoked and was not a legal entity when the suggestion was served; that he altered a *copy* of

---

**11.** We held in syllabus point 3 of *Lawyer Disciplinary Bd. v. Scott,* 213 W.Va. 209, 579 S.E.2d 550 (2003), that

[m]itigating factors which may be considered in determining the appropriate sanction to be imposed against a lawyer for violating the Rules of Professional Conduct include: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings: (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.

the suggestion and not the original; that his client was entitled to the suggestion against Jamie Woods; and that he did not attempt to recover more than the amount due. The respondent attorney also argued that he altered the suggestion for the sole purpose of ensuring timely recovery for his client.

This Court in *Losch* found the respondent attorney's conduct to be unethical and in violation of the Rules. However, we rejected the portion of the Board's recommendation that he be suspended from the practice of law for thirty days and that his law practice be supervised for one year following reinstatement, explaining that these sanctions were "not necessary for the purposes of punishment of the respondent or restoration of public confidence in the ethical standards of the legal profession." *Id.* at 320, 633 S.E.2d at 265. Rather, this Court articulated its belief that

> suspension, in this case, would likely be more detrimental to the respondent's clients than punitive to the respondent. Furthermore, the violation in this case represents a single act rather than a pattern of professional misconduct that suggests the need for supervision. Additionally, we note that in this case there is but a single count in the charges against the respondent, and this is the first instance of the respondent having been before this Court for a violation of the [Rules].

*Id.*

In the instant case, Respondent contends that, as in *Losch*, his misconduct involved a single set of circumstances unlikely to repeat itself. Though his improper activities occurred over a two-year period, Respondent argues they were "tied together under a common theme and common purpose" and constitute a "one time event." Furthermore, Respondent points out that, like the attorney in *Losch*, he was charged with only one count of violating the Rules. Finally, Respondent contrasts his conduct to that in *Losch*, arguing that his actions were less egregious than in *Losch* because neither he nor his clients benefited from his actions; likewise, his actions had no detrimental impact on OFN's clients. Thus, Respondent argues that, as in *Losch*, suspension of his law license is too great a sanction considering the facts unique to this case.

Though the use of e-mail and other computer technology has become widely used in the legal profession, legal ethics cases involving their abuse or misuse are very few. In *In re Brown*, 368 S.C. 174, 628 S.E.2d 885 (2006), an attorney admitted to secretly accessing the e-mail accounts of more than forty co-workers for the purpose of "monitor[ing] management activity and anti-union sentiment during a unionizing effort that [she] initiated and supported." 628 S.E.2d at 886. During a period of twenty-eight months, the attorney read, downloaded, disseminated and, in some instances, deleted information contained in the e-mails, without the authorization or knowledge of the e-mail account holders. For her professional misconduct, the attorney's law license was suspended for a period of two years.

In *In re Schwartz*, 278 Ga. 216, 599 S.E.2d 184 (2004), the offending attorney admitted that for a 13–14 month period he "accessed, listened to, and randomly deleted voice mail messages left on the voice mail system of his former employer," a law firm which had previously discharged him. *Id.* Though his actions, a violation of Georgia's Rules of Professional Conduct, were punishable by disbarment, the Supreme Court of Georgia agreed to accept the attorney's petition for voluntary discipline of an 18–month suspension of his law license. The Court in *Schwartz* was persuaded by certain mitigating factors, including the fact the attorney had "no prior or subsequent incidents of inappropriate behavior related to his professional conduct; appears to be well-respected by other members of the Bar; has been forthright in his dealings with the State Bar regarding this matter; and has demonstrated contrition and remorse." *Id.*

■ In the instant matter, we are mindful of the mitigating factors presented by Respondent including the unique circumstances which motivated his misconduct in the first place. However, there are also several aggravating factors which this Court cannot

ignore or minimize.[12] Though Respondent initially accessed his wife's OFN e-mail account with motives very personal to his marriage, his misconduct eventually became more rampant. Out of simple curiosity, he broke into the e-mail accounts of eight of his wife's unsuspecting co-workers on almost a daily basis for over a two-year period. He did not cease or disclose his actions until he learned OFN's computer experts were on the verge of discovering who was behind the unauthorized intrusions. Moreover, in addition to confidential personal information, Respondent viewed confidential financial information intended to be read exclusively by OFN partners. With regard to confidential client information, in one instance, his firm and OFN represented separate co-defendants which had interests adverse to each other because Respondent's client had an indemnity claim against OFN's client.

Presently, there is no evidence that Respondent has used or misused the information he improperly accessed from OFN. Nevertheless, we must recognize that OFN has suffered negative consequences from Respondent's actions. Not only was OFN forced to expend valuable time and resources to investigate the matter, but it was also required to disclose the unfortunate events to its clients, opening itself up to potential lawsuits and professional embarrassment. Moreover, one is unable to predict or tangibly quantify the future impact of Respondent's misconduct on OFN or on Respondent's former law firm in terms of attracting new clients.

Finally, we recognize that with the widespread use of computer e-mail as an important method of communication between and among attorneys and their clients comes the potentiality that the communication might be improperly infiltrated. This Court does not take lightly the fact that, in this case, it was an attorney who repeatedly accessed the confidential e-mails of other attorneys without their knowledge or permission. Thus, the imposition of a suitable sanction in a case such as this is not exclusively dictated by what sanction would appropriately punish the offending attorney,[13] but, just as importantly, this Court must ensure that the discipline imposed adequately serve as an effective deterrent to other attorneys,[14] "to protect the public, to reassure it as to the reliability and integrity of attorneys and to safeguard its interest in the administration of justice." *Battistelli*, 206 W.Va. at 201, 523 S.E.2d at 261, quoting *Lawyer Disciplinary Board v. Taylor*, 192 W.Va. at 144, 451 S.E.2d at 445. Accordingly, based upon the foregoing, we are compelled to adopt the recommendation of discipline tendered by the Board.

### IV. Conclusion

For the reasons stated above, we adopt the Board's recommendations and hereby impose the following sanctions upon Respondent: (1) Respondent is suspended from the practice of law in West Virginia for a period of two years; (2) upon reinstatement, Respondent's private practice shall be supervised for a period of one year; (3) Respondent is ordered to complete twelve hours of CLE in ethics in addition to such ethics hours he is otherwise required to complete to maintain his active license to practice, said additional twelve hours to be completed before he is reinstated; and (4) Respondent is ordered to pay the costs of these proceedings.

License suspended, with additional sanctions.

Justice STARCHER concurs and files opinion.

STARCHER, J., concurring:

(Filed June 2, 2008)

While I am joining in the decision to impose disciplinary sanctions upon the respondent attorney, Michael P. Markins, I write separately to express my preference for

---

12. "Aggravating factors in a lawyer disciplinary proceeding are any considerations or factors that may justify an increase in the degree of discipline to be imposed." *Scott*, 213 W.Va. at 210, 579 S.E.2d at 551, syl. pt. 4.

13. Indeed, during the disciplinary hearing in this case, it was abundantly clear that Respondent and his family have already suffered greatly as a result of Respondent's misconduct.

14. *See Wade*, 217 W.Va. at 60, 614 S.E.2d at 707, syl. pt. 4.

somewhat different sanctions—a penalty that would have required the respondent to make restitution for injuries that resulted from his conduct.

The facts in this case are well-stated in the Court's opinion and will not be repeated except to note that a victim of the respondent's conduct, the law firm of Offutt Fisher & Nord ("OFN"), suffered a significant economic loss in investigating the unlawful intrusion into its computer e-mail system. OFN was required to hire a computer systems engineer to investigate the integrity of its computer systems and to institute remedial measures. Additionally, OFN was required to expend resources with respect to the investigation and the aftermath of the discovery of the intrusion.

According to D.C. Offutt, managing partner of OFN, "There is no way to realistically quantify the overall economic loss or the overall impact it had on the firm." Offutt also stated, "The negative ramifications and effect of Markins' deliberate assaults on the firm's computer network is not completely known and will never be fully known. What is known, for certain, is that the negative ramifications of his illegal actions will continue for years to come and the stigma placed on the firm may never be completely erased." Furthermore, the respondent's own law firm was also required to conduct an independent investigation and review its own computer system.

Rather than acknowledging and taking responsibility for his conduct, the respondent suggests that he "has suffered the most from his actions." Furthermore, the respondent attempts to excuse himself from the obligation for making restitution by pointing to Mr. Offutt's failure to quantify the amount of the injury during Mr. Offutt's testimony before the Hearing Panel Subcommittee.

Remarkably, the Lawyer Disciplinary Board discussed the significance of the injury caused by the respondent's conduct, yet failed to recommend the imposition of restitution as permitted by Rule 3.15 of the *Rules of Lawyer Disciplinary Procedure.*[1]

I believe that if this Court is to be guided in lawyer disciplinary matters by crafting sanctions designed to restore and maintain confidence in lawyer disciplinary procedures and in our legal system, then this Court must require lawyers who cause actual injury to make restitution for their wrongful conduct.

For the forgoing reasons I would have preferred to remand this matter to the Lawyer Disciplinary Board with instructions to conduct further investigation into the damages incurred by the law firms of Offutt Fisher & Nord and Huddleston Bolen LLP as a result of he respondent's conduct. The Board should quantify the damages, review Mr. Markins' earnings capacity, evaluate his ability to make restitution, and recommend a payment schedule to the Court. With this information, the Court could better determine an appropriate period of suspension for Mr. Markins—whether to impose a longer or shorter suspension, taking into consideration Mr. Markins' obligation to make restitution in this matter.

---

1. Rule 3.15 of the *Rules of Lawyer Disciplinary Procedure* state in relevant part:

 **Rule 3.15. Permissible sanctions.**

 A Hearing Panel Subcommittee may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Rules of Profession-al Conduct or pursuant to Rule 3.14: (1) probation; (2) *restitution;* (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment. . . .
 (Emphasis added.)